# United States Court of Appeals

## For the First Circuit

Nos. 22-1882, 23-1315, 23-1322

UNITED STATES,

Appellee,

v.

LOUIS D. COLEMAN III,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Rikelman and Lynch,
Circuit Judges.*

Christine DeMaso, Assistant Federal Public Defender, for
appellant.

Randall E. Kromm, Assistant United States Attorney, with whom
Joshua S. Levy, Acting United States Attorney, was on brief, for
appellee.

---

* Judge Selya heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's decision. The remaining two panelists
issued the opinion pursuant to 28 U.S.C. § 46(d).

July 21, 2025

**RIKELMAN**, <u>Circuit Judge</u>.  After a 15-day trial, a jury convicted Louis Coleman of kidnapping resulting in death under 18 U.S.C. § 1201(a)(1).  The district court imposed the sentence required by statute, life in prison without the possibility of parole.  On appeal, Coleman alleges a wide array of errors throughout the district court proceedings.  After careful consideration of the voluminous record, we find no error.  Thus, we affirm Coleman's conviction and sentence.

## I. BACKGROUND

The tragic events at the center of this case occurred in late February 2019.  In the pre-dawn hours of Sunday, February 24, Coleman encountered Jassy Correia on a street in downtown Boston, Massachusetts.  The two walked to his car together at around 2:15 a.m.  Two hours later, Coleman drove into the parking lot of his apartment building in Providence, Rhode Island.  Video footage from building cameras captured him carrying Correia's limp body into his apartment.  Four days later, the police stopped Coleman on a highway in Delaware and found Correia's dead body in his trunk.  At trial, the parties vigorously disputed what transpired between Coleman and Correia in those critical two hours on Sunday morning.

Because Coleman challenges the sufficiency of the government's evidence against him, "[w]e recount the relevant facts as presented at trial 'in the light most favorable to the

jury's verdict, consistent with record support.'" United States v. Katana, 93 F.4th 521, 525 (1st Cir. 2024) (quoting United States v. Akoto, 61 F.4th 36, 38 (1st Cir. 2023)). In evaluating Coleman's other claims on appeal, "we offer a balanced treatment, in which we objectively view the evidence of record." United States v. Greaux-Gomez, 52 F.4th 426, 430 (1st Cir. 2022) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)). "Because 'we cannot simultaneously recite the facts in both manners, we limit our initial summary . . . to those details essential to framing the issues on appeal,'" and provide additional details later in our analysis, as needed. Id. (quoting Burgos-Montes, 786 F.3d at 99).

## A. Coleman Goes Out in Boston

After several days of illness, Coleman decided to go out in Boston on Saturday night, February 23, 2019. At the time, he was an engineer at the defense company Raytheon. He asked friends to join him, but they were unavailable, so he drove from Providence to Boston by himself. He entered Venu, a nightclub in downtown Boston, around 1:00 a.m. on February 24.[1]

---

[1] During their investigation, law enforcement officers collected surveillance footage from cameras inside and outside of Venu, other areas of downtown Boston, and parts of Providence. The jury viewed much of this footage during trial, and it is thus part of the record that we summarize here. Except where we note otherwise, we do not distinguish between testimony at trial and events captured on camera.

At Venu, Coleman met and spent time with Lorna Horace. They began talking at about 1:20 a.m. and soon exchanged phone numbers. They also danced, held hands, and kissed. Shortly before Venu closed at 2 a.m., Lorna's brother, Ednel Horace, separated Coleman and Lorna.[2] The Horace siblings left Venu together with their friends. Coleman exited Venu around the same time.

**B. Correia Celebrates Her Birthday with Friends**

Correia was celebrating her upcoming twenty-third birthday that same weekend. At the time, she was living in a shelter with her young daughter and had received a pass to leave for the weekend, with plans to return by 5:00 p.m. on Sunday. She had arranged for her daughter's grandmother, Rosina Castro, to watch her daughter so that Correia could stay overnight on Saturday with her friend, Yvania Mondesir.

To celebrate her birthday, Correia planned to go with friends to Venu on Saturday night. During the day, she met Mondesir at her apartment in Dorchester, and the two went shopping for clothes for that evening. Correia bought herself an orange jumpsuit and shoes and bought Mondesir a new outfit as well. They spent the rest of the day at Mondesir's apartment. Mondesir testified at trial that they did not drink alcohol before going to Venu but may have smoked marijuana. She also testified that they

_____

[2] Because Lorna and Ednel Horace have the same last name, we refer to them by their first names to avoid confusion.

- 5 -

did not take any other drugs. Correia dressed for the night in the orange jumpsuit that she had bought earlier, open-toed shoes, and a jean jacket.

Two of Correia's friends, Aja Hiltz and Reginald Thomas, had agreed in advance to pick up Correia and drive her to Venu that night. Because of confusion about where Correia was staying for the weekend, Hiltz and Thomas only arrived at Mondesir's apartment in Dorchester close to midnight. The group -- Correia, Hiltz, Mondesir, and Thomas -- then proceeded to Venu. There was some tension in the car because Hiltz did not know in advance that Mondesir would be joining them. After waiting in line, the group eventually entered the nightclub at about 12:40 a.m.

In Venu, the group ordered a bottle of champagne and then later a round of shots. The three women danced, while Thomas stayed at the bar. At one point, Correia and Mondesir began to argue. The argument between the two escalated and Mondesir pushed Correia. Hiltz testified at trial that Mondesir had been the aggressor and Correia had tried to pacify Mondesir. The argument occurred around 2 a.m., when Venu was closing for the night.

A little after 2 a.m., Correia, Hiltz, and Thomas prepared to leave Venu. Correia appeared to be struggling to navigate the stairs in the club and sat down to take off her shoes. While Correia was seated, Mondesir approached her again but Hiltz kept the two women separated. They exited Venu and crossed a

street into an alley. In the alley, Mondesir yelled at Correia and pushed her again. Shortly afterwards, Hiltz asked both Correia and Mondesir to leave with her. Hiltz told Correia several times that Correia should come with her, or Hiltz would leave, but Correia decided to take an Uber instead. By the time Hiltz and Thomas were ready to depart, the full group had migrated out of the alley and onto Tremont Street. It was about 2:14 a.m. when Hiltz and Thomas actually left. Afterwards, Mondesir pushed Correia one more time and Correia fell on the sidewalk.

After getting up from the sidewalk, Correia walked away from Mondesir and towards a minivan parked on the street, which she attempted to enter. The minivan had an Uber decal but the driver, Tamer Alqasir, testified at trial that he explained to Correia that he could not take her. In response, Correia tried to pull the window down and told him that if he rolled the window up, she would call the police. After Correia persisted and opened the door to his car, Alqasir pushed her to prevent her from sitting in the passenger seat. Correia fell outside of the minivan and then threw snow at the door.

## C. Coleman and Correia Leave Together

It was at this point, after Alqasir pushed Correia out of his minivan, that Coleman and Correia met for the first time. Coleman approached Correia by the minivan at 2:16 a.m. Alqasir

testified at trial that Coleman told Correia something along the lines of "this is not your Uber."

Coleman and Correia then walked a few steps away from the minivan and talked briefly, holding each other's hands as they spoke.  After about 30 seconds of conversation, they walked down Tremont Street towards Coleman's parked car, still holding hands, arriving at the car at 2:20 a.m.  During the walk, Correia, who did not have her shoes, jumped on Coleman's back and he carried her piggyback-style.  When they reached the car, Correia climbed into the passenger seat on her own, and Coleman proceeded to the driver's side.  They drove away about two minutes later.

Coleman parked again on another part of Tremont Street at 2:32 a.m., where he and Correia remained for about 12 minutes.  Although the street was lit, video footage does not show what happened inside Coleman's car during those 12 minutes, but it does show that other vehicles drove by his car.  After that stop, Coleman drove down Tremont until he turned right onto a one-way street.  Finding two police cruisers blocking the end of that street, Coleman quickly backed up the block and turned back onto Tremont Street, heading north.  Location data then showed him proceeding in the direction of I-93 and merging onto I-93 in the direction of I-95 South.  Sometime later, Coleman drove north again, and location data placed the car near South Quincy around

3:20 a.m.  Finally, Coleman began to travel south again, eventually entering Rhode Island.

Coleman drove into the parking lot of his apartment building in Providence around 4:00 a.m.  He proceeded to exit his car, retrieve a white comforter from his apartment, and return to the car.  Video footage from inside and outside his apartment building showed Coleman carrying a body out of his car -- law enforcement later identified the body as Correia based on the orange jumpsuit.  Coleman carried Correia's limp body through the lobby of his apartment building, into the elevator bank, and out of the elevator onto the sixth floor, where he lived.  Correia's body was naked from the waist up.

There is no video evidence from the early hours of Sunday after Coleman entered his apartment unit.  Coleman's neighbor testified at trial, however, that she woke up due to loud banging and a closet door being slammed shut early Sunday morning.

Some of Coleman's actions over the following days were recorded on video by cameras in his building and in various stores. Videos and receipts showed that Coleman purchased several items between February 24 and 27, including a scented candle and lighter from RiteAid; pelletized limestone from Home Depot; and baking soda, coveralls, a mask, safety goggles, an odor respirator, CLN Release Bleach, a large suitcase, and a gas canister from several Walmart stores.  Location data further revealed that Coleman

visited two car washes within the span of thirty minutes on Sunday, February 24.

During the same few days, Coleman conducted various internet searches. Forensic analysis of his hard drive revealed that Coleman researched topics including hardship withdrawals from Fidelity, a car air freshener, an air purifier, sanitizing Clorox, a turkey baster, and turkey baster alternative. He additionally searched questions, such as "[c]an a person fit in a suitcase," "[h]ow to clean for embalming," "[o]il barrel, where to purchase," and "[h]ow to pull a tooth that's not loose." On February 24, Coleman installed the application IPVanish on his computer, which is used to hide a user's IP address.

### D. The Investigation

Both Mondesir and Correia's father reported Correia missing to the Boston Police Department (BPD) on Tuesday, February 26, 2019. In response, BPD officers conducted interviews and collected and reviewed video recordings from Venu and other businesses in the area. Through this review, BPD learned that Correia left Venu with a man. They later identified the man as Coleman and connected him to an address in Providence.

After learning that Coleman was a person of interest in a missing person investigation, Providence Police Department (PPD) officers conducted a wellness check at Coleman's address just before 1:00 a.m. on February 28, 2019. They were unable to enter

- 10 -

the building.  Coleman was not in the building at the time but likely saw the police cruisers from where he was walking outside. He returned to his apartment building at 1:00 a.m. and began to pack his car, making several trips from his apartment to the car between 1:00 a.m. and 4:05 a.m.  He placed the suitcase that he had bought earlier in the week in the trunk of his car, noticeably struggling with its weight.  After he finished packing his car, he drove away.

Officers from both the BPD and PPD returned to Coleman's address the morning of February 28.  They entered Coleman's apartment, as the door had been left slightly open and appeared to be broken.  The officers noticed that the apartment was "extremely cold," all the windows were open, and there was "a very strong smell of cleaning solution."  While walking around the apartment, they also noticed that the bathroom shower curtain and a couch cushion were missing.  At that point, the officers decided to leave the apartment and call their supervisors.  The apartment was searched carefully later that afternoon, pursuant to a warrant. On the same day, law enforcement gained access to surveillance videos from the apartment building and reviewed hundreds of videos, including the footage we describe here.

As the investigation proceeded in Providence, members of BPD's Special Investigations Unit executed an "exigent request" to

use "pings" to locate a phone that they had linked to Coleman.[3] From the video footage review, law enforcement also identified the make, model, and license plate of Coleman's car. With that information, officers confirmed that Coleman's car had OnStar, a built-in navigation system that can act as a GPS unit. They made an emergency request to OnStar to turn on the OnStar unit in Coleman's car. Using location information from pings to Coleman's phone and OnStar, law enforcement discovered that Coleman was driving south from Rhode Island. They located him near Wilmington, Delaware around 1:41 p.m., and contacted Delaware State Police (DSP).

DSP officer Hasan Halis stopped Coleman's car on I-95 South, as Coleman was exiting the highway. After back-up arrived, DSP officers arrested Coleman and asked him if anyone else was in the car, to which he responded, "in the trunk." DSP officers then gave commands to see if anyone would exit the trunk, at which point Coleman said, "she's dead." The officers searched the car and found Correia's body covered in white powder in the suitcase; she was bound with duct tape and inside a couch cushion, which was inside a trash bag. The DSP paramedic on the scene concluded that Correia was dead.

---

[3] At trial, an officer defined "pings" as a process by which "the phone company can reach out to the phone, ping the phone and get its geographical location" based on the phone's connection to a cell tower.

Soon after arresting Coleman, DSP officers observed a bandage on his face and asked him if his injury needed to be addressed. Coleman responded, "it's from the girl."

Following the arrest, officers recovered various items from Coleman's car, including a computer tower, a red gas can, a Bic lighter, a ski mask, contractor bags, gloves, pliers, and hedge trimmers. They also observed damage to the car itself, namely two cracks to the windshield on the passenger side. The cracks were processed for DNA testing, and the swabs of the windshield's interior produced matches for both Coleman's and Correia's DNA.

The day after police arrested Coleman and recovered Correia's body, Delaware Medical Examiner Dr. Jennie Vershvovsky conducted an autopsy. She later testified about her findings at trial. Dr. Vershvovsky stated that Correia weighed 119 pounds at the time of her death and had numerous abrasions and contusions on her face, which had occurred while Correia was still alive. She also stated that Correia had injuries around her neck and provided her medical opinion that the cause of Correia's death was strangulation.

When Dr. Vershvovsky performed the autopsy, she used a sexual assault kit to collect an oral swab, a vaginal swab, a rectal swab, fingernail scrapings, and fingernail clippings from Correia's body. Semen matching Coleman's DNA was identified on the vaginal swab. Coleman's DNA was also matched to the rectal

swab and fingernail scrapings and clippings.  Dr. Vershvovsky testified that there were no injuries to Correia's vagina or anus, but that the lack of lacerations or bruising in these areas did not rule out sexual assault.

Dr. Vershvovsky also ordered a toxicology analysis of Correia's blood.  The toxicology report came back positive for both cocaine and marijuana.  The report also showed a blood alcohol concentration of 0.21 grams per deciliter, three times the presumptive intoxication level in Massachusetts.  A forensic toxicologist testified that the combination of these substances, particularly cocaine and alcohol, can cause paranoia and violence.

### E. Legal Proceedings

A grand jury returned an indictment charging Coleman with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) on April 4, 2019.  Coleman's trial took place in May 2022.

The government's theory of the case, in short, was that Coleman had deceived Correia by offering her a ride to Mondesir's apartment when his intent was to have sex with her.  According to the government, Coleman sexually assaulted and killed Correia in his car during the 12-minute stop on Tremont Street.  At trial, Coleman did not dispute that he caused Correia's death.  Instead, the defense argued that Correia left with Coleman voluntarily, they had consensual sex, and they later got into a sudden and

unexpected argument that turned violent and resulted in Correia's death.

The jury returned a guilty verdict on June 1, 2022. The district court sentenced Coleman to life in prison.

Coleman timely appealed the verdict and sentence.[4]

## II. DISCUSSION

We now analyze each of Coleman's legal claims, moving chronologically through the stages of his prosecution.

### A. The Indictment

Coleman raises three challenges related to his indictment, each of which he preserved in the district court. First, he argues that the indictment was constitutionally insufficient for failing to provide facts specific to core elements of kidnapping. Second, he argues that the district court erroneously denied his motion for a bill of particulars. Third, he argues that the government's reliance at trial on evidence that he kidnapped Correia for sexual gratification violated the Presentment Clause of the Fifth Amendment because that theory was not presented to the grand jury. We evaluate each challenge in turn.

---

[4] With the permission of this court, Coleman submitted a pro se brief in addition to his counseled brief. In our analysis, we distinguish between the arguments raised in the two briefs.

## 1. Sufficiency of the Indictment

We begin with Coleman's argument that the indictment was constitutionally defective. We review a challenge to the sufficiency of an indictment de novo. United States v. Savarese, 686 F.3d 1, 6 (1st Cir. 2012).

An indictment is generally constitutionally adequate if it "specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy." Id. Under our precedent, an indictment meets this standard if it "use[s] the statutory language to describe the offense," so long as it also includes enough "facts and circumstances . . . to inform the accused of the specific offense with which he is charged." Id. (citing United States v. Mojica-Baez, 229 F.3d 292, 309 (1st Cir. 2000)).

The grand jury charged Coleman under the federal kidnapping statute, which provides:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when[] the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense[] shall be

- 16 -

> punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a)(1). The indictment contained only one count, and it stated:

> On or about February 24, 2019, in the District of Massachusetts, and elsewhere, the defendant,
>
> LOUIS D. COLEMAN, III,
>
> did unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold, for ransom and reward and otherwise, Jassy Correia, when Ms. Correia was willfully transported in interstate commerce, and when Louis D. Coleman, III traveled in interstate commerce in committing and in furtherance of the commission of offense, resulting in the death of Ms. Correia.
>
> All in violation of Title 18, United States Code, Section 1201(a)(1).

Coleman argues that the indictment was insufficient because it alleged only broad statutory language without providing factual specificity. He points to three problems in particular. According to Coleman, the indictment left the government free to pursue any theory because it alleged that Coleman "seized, confined, inveigled, decoyed, kidnapped, abducted, or carried Correia away." Next, he claims the indictment omitted "how or when he held her involuntarily for an appreciable period." Finally, he contends the indictment omitted the purpose for which Coleman kidnapped Correia. Coleman argues that the "omitted

- 17 -

elements go to the core of the kidnapping charge," and thus he needed this information to adequately prepare his defense.

We disagree that the indictment needed to be more specific to pass constitutional muster. To begin, it was permissible to list each statutorily available method of kidnapping in the alternative in the indictment. Coleman points us to no case where we have held that an indictment is constitutionally deficient for including alternative theories. Further, requiring the government to charge only one means of establishing an element when multiple means are statutorily available would conflict with the well-established rule that "where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means." United States v. García-Torres, 341 F.3d 61, 66 (1st Cir. 2003) (quoting United States v. Simpson, 228 F.3d 1294, 1300 (11th Cir. 2000)); see also United States v. Mubayyid, 658 F.3d 35, 70 (1st Cir. 2011);[5] United States v. Howard, 742 F.3d 1334, 1344 n.3 (11th Cir. 2014) (collecting cases across circuits).

---

[5] Mubayyid, which was cited by the government, involved a challenge to the sufficiency of the evidence against the defendant. See 658 F.3d at 69. The defendant had been charged with concealing two material facts, and we held that the verdict could stand if the evidence was sufficient as to either fact. See id. at 69-70. Coleman argues that Mubayyid is distinguishable because the defendant in that case did not challenge the sufficiency of the relevant count of the indictment and because the indictment described the two facts with specificity. (The defendant had

Next, the indictment was not required to be more specific as to precisely when or how Coleman "held" Correia. The use of the word "hold," combined with the other facts about when and where Correia's alleged kidnapping occurred, was sufficient to apprise Coleman of this element of the offense. See United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (rejecting argument that the indictment needed to specify overt acts constituting attempted illegal re-entry into the U.S. and finding the use of the statutory word "attempt," when combined with facts about the time and place of defendant's attempted re-entry, constitutionally sufficient); United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (the indictment "need only outline 'the elements of the crime and the nature of the charge'" (quoting United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011))).

Coleman points to our decision in United States v. Murphy as an example of a case in which we found an indictment defective for failing to provide specific facts, but that case involved special circumstances not at issue here.[6] See 762 F.2d 1151 (1st Cir. 1985). In Murphy, the defendants were charged with

challenged a different count of the indictment before the district court, which had dismissed that count, and the government appealed. See id. at 46-47.) Although the details of Mubayyid are different, the general principle articulated in Mubayyid applies here.

[6] Coleman also cites United States v. Santa-Manzano, 842 F.2d 1 (1st Cir. 1988), which we address in relation to his Presentment Clause argument. See infra Section II.A.3.

intimidating a witness to interfere with an official proceeding in violation of 18 U.S.C. § 1512(a)(1). See id. at 1153. The indictment specified the date, location, and victim of the charged offense, but not the specific proceeding that the defendants were accused of attempting to influence. See id. We found the indictment defective for failing to specify the proceeding, explaining that a defendant could not properly prepare a defense without "at least some indication of the identity of the proceeding in which the defendant tried to influence testimony." Id. at 1154-55. The name of the witness was not sufficient to indicate the proceeding because the witness was an informant in multiple cases, and the government changed its theory about which proceeding defendants had allegedly tried to influence during the course of the trial. See id. at 1152-53. "[W]hat is a fair description of a crime for purposes of permitting an adequate defense necessarily varies with the nature of the offense and the peculiarities of defending against the kind of charge involved." United States v. Tomasetta, 429 F.2d 978, 979 (1st Cir. 1970). In this case, where Coleman was charged with holding a specific person on a specific date, there is no similar need to specify in greater detail how the hold happened for Coleman to prepare a defense.

Similarly, the indictment did not need to specify Coleman's purpose in holding Correia. We previously ruled that "the phrase 'for ransom or reward or otherwise'" (the purpose

element) is "a necessary element" of federal kidnapping which should be included in the indictment. United States v. Calderon, 77 F.3d 6, 9-10 (1st Cir. 1996) (quoting 18 U.S.C. § 1201). We did not suggest, however, that the indictment needs to be more specific than the statutory language to provide sufficient notice of the purpose element. See id. We now join our sister circuits in rejecting the argument that an indictment for kidnapping needs to state the purpose of the defendant with more specificity than the statutory language. See Hall v. United States, 410 F.2d 653, 659-60 (4th Cir. 1969) (indictment that alleged the victim was held "for ransom[,] reward[,] and otherwise" was sufficient); United States v. Bentley, 310 F.2d 685, 685 (6th Cir. 1962) (same); Loux v. United States, 389 F.2d 911, 916 (9th Cir. 1968) (same); United States v. Atchison, 524 F.2d 367, 370-71 (7th Cir. 1975) (same); see also United States v. Webster, 162 F.3d 308, 328 (5th Cir. 1998); United States v. Boykin, 794 F.3d 939, 945-48 (8th Cir. 2015); United States v. Adams, 83 F.3d 1371, 1373-75 (11th Cir. 1996).[7]

The indictment here "faithfully tracks the language of the statute" and "notifies [Coleman] not only of the elements of the crimes charged, but also of the relevant facts." Savarese,

---

[7] We note that Atchison, Webster, Boykin, and Adams are at odds with our precedent in Calderon to the extent that they do not treat the defendant's purpose as an element of 18 U.S.C. § 1201.

686 F.3d at 7. Namely, it provides the date of the alleged kidnapping, the name of the victim, and the location.[8] Nothing more is required. See Stepanets, 879 F.3d at 372-73; Resendiz-Ponce, 549 U.S. at 108, 110 (finding an indictment that tracked the statutory language and specified the date and location of the charged offense constitutionally sufficient, and explaining that modern pleading rules do not require "detailed allegations").

## 2. Bill of Particulars

We now turn to Coleman's argument that the district court erroneously denied his motion for a bill of particulars. The court found that a bill of particulars was not necessary here for Coleman "to help prepare a defense, avoid surprise, or protect against double jeopardy." We review the denial of a bill of particulars for abuse of discretion. United States v. Sepulveda, 15 F.3d 1161, 1193 (1st Cir. 1993).

---

[8] The location alleged in the indictment is admittedly broad. But we assess the adequacy of the indictment in the context of the crime charged. See Tomasetta, 429 F.2d at 979. The location described in the indictment ("in the District of Massachusetts, and elsewhere") was appropriate here, particularly in light of Coleman's interstate travel. Compare id. (indictment charging the defendant "of making threats by an unstated means to an unnamed person on a particular day in a city of moderate size" was constitutionally insufficient); with United States v. Hallock, 941 F.2d 36, 38, 40 (1st Cir. 1991) (indictment that charged conspiracy "in the District of Maine and elsewhere" and listed the defendant's coconspirators was sufficient because "a conspiracy does not normally occur at only one particular time or place" and the defendant had "the most relevant names").

- 22 -

Bills of particulars are rarely used in modern prosecutions. See id. at 1192. "When pursued, they need be granted only if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause." Id. at 1192-93.

The district court did not abuse its discretion by denying Coleman's motion for a bill of particulars. To the extent Coleman argues that he could not prepare a defense because the government had not settled on a theory of how the kidnapping occurred, we find that argument unpersuasive considering our holding that it was permissible for the government to charge alternative elements in the conjunctive. See supra Section II.A.1. And, to the extent he argues that he was unfairly surprised, his sole example is Dr. Vershvovsky's testimony that Correia was alive when Coleman carried her into his apartment. But the district court properly struck that testimony so any prejudice was mitigated.[9] Further, given the government's statement at trial that it had not expected that testimony either, we see no basis to conclude that a bill of particulars would have prevented this

---

[9] We address this issue in greater detail below, in evaluating Coleman's argument that the district court erroneously denied a mistrial based on the same testimony. See infra Section II.E.1.

surprise. Finally, Coleman has not developed an argument as to why he needed a bill of particulars to avoid double jeopardy.

### 3. Presentment Clause

We now turn to Coleman's argument that he was convicted based on allegations not presented to the grand jury, in violation of his constitutional rights under the Presentment Clause. The Presentment Clause of the Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V.

Coleman contends that the admission of evidence at trial that he kidnapped Correia for sexual gratification violated the Presentment Clause because the indictment did not allege that his purpose was sexual gratification and, in his view, the government had no evidence at the time of the indictment that it could have presented to support that theory. Because, Coleman reasons, the grand jury could not have indicted him on the sexual gratification theory, he argues that he has a claim "analogous to a pretrial motion raising a constructive amendment."

The government disagrees with Coleman's characterization of his claim. It views Coleman's argument as a challenge to the sufficiency of the evidence before the grand jury, which is the type of challenge that we are barred from deciding. See Kaley v. United States, 571 U.S. 320, 328 (2014); United States v. Capozzi,

486 F.3d 711, 726 (1st Cir. 2007) ("A court should not inquire into the sufficiency of the evidence before the indicting grand jury . . . ." (quoting United States v. Maceo, 873 F.2d 1, 3 (1st Cir. 1989))).

We agree with Coleman that he has raised a constitutional claim we can review, but we treat his argument as raising a prejudicial variance claim, not a constructive amendment claim. We review constructive amendment and prejudicial variance claims de novo. See Katana, 93 F.4th at 530.

### i. Constructive Amendment

"A constructive amendment occurs when the government's evidence or arguments or the court's jury instructions alter the terms of an indictment such that the defendant is effectively charged with a different offense than the one returned by the grand jury." Id. "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction" in part because it violates a defendant's rights under the Presentment Clause. Id. (cleaned up) (citation omitted).

Under our modern constructive amendment precedent, we focus on the offense charged in the indictment, not the particular theories of liability. Id. at 532 (citing United States v. Simon, 12 F.4th 1, 35 (1st Cir. 2021)). And we look to statutory elements in response to claims by defendants that the crime charged has been changed. See id.

The district court's decision to admit evidence that the government relied on to argue that Coleman kidnapped Correia for sexual gratification did not amount to a constructive amendment or violate the Presentment Clause. Coleman was indicted for kidnapping Correia and causing her death on February 24 in violation of 18 U.S.C. § 1201(a)(1), and the jury convicted him of that same crime. The admitted evidence concerned an element of that crime (namely, Coleman's purpose in kidnapping Correia). It did not alter the "substance of the charge." United States v. Dowdell, 595 F.3d 50, 68 (1st Cir. 2010) (quoting United States v. Eirby, 262 F.3d 31, 38 (1st Cir. 2001)). There was thus no constitutional violation. See id. at 67-68 (amendment to the indictment to reflect distribution of "cocaine base" rather than "cocaine" did not violate the Presentment Clause because the charged offense, 21 U.S.C. § 841(a), prohibits the distribution of any controlled substance); see also Gooch v. United States, 297 U.S. 124, 128 (1936) (explaining Congress enlarged the federal kidnapping statute to encompass a kidnapping for any benefit to the defendant).

Coleman relies on our prior decision in United States v. Santa-Manzano to argue otherwise, but that decision is not on point. See 842 F.2d 1 (1st Cir. 1988). In Santa-Manzano, the indictment charged a specific fraudulent scheme involving the sale of fake certificates of deposit, including a sham office where

unsuspecting buyers would be lured into purchasing these false certificates, but, at trial, the government proved an entirely different fraudulent scheme involving the sale of a worthless line of credit in return for 18 million Venezuelan bolivars. See id. at 2. The indictment did not specify the property that was the object of the charged scheme to defraud. See id. We thus found that indictment constitutionally deficient because it "suggest[ed] a different [crime]" than "the crime the government sought to prove." Id. at 2-3. By contrast, Coleman's indictment properly alleged the elements of the crime, including the purpose element, and the government became more specific about its purpose theory both during discovery and at trial. Under our case law, the narrowing of a charge is at most a variance from the indictment. See United States v. Mueffelman, 470 F.3d 33, 38-39 (1st Cir. 2006); Katana, 93 F.4th at 530. And as we discuss below, we conclude there was no prejudicial variance here.

### ii. Prejudicial Variance

A variance occurs when the government relies on different facts at trial than it alleged in the indictment to prove the same offense. See Katana, 93 F.4th at 530. In contrast to a constructive amendment, a variance requires reversal only if there is prejudice to a "defendant's substantial rights, i.e., the right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial," and to prevent a second

prosecution for that same offense.  Id. (quoting United States v. Vega-Martínez, 949 F.3d 43, 51 (1st Cir. 2020)); see also United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005) ("[S]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged -- so long as the difference does not cause unfair prejudice." (quoting United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995))).  Coleman has the burden to show such prejudice. See Mueffelman, 470 F.3d at 39.

We are not convinced that there was any variance here. Coleman argues that no evidence of "sexual assault or sex at all" was presented to the grand jury.  For example, he contends that the results of the DNA test on Correia's sexual assault kit were not even available to the grand jury before it returned its indictment.  To the extent Coleman claims that the grand jury could not have found, as a matter of fact, that his purpose was sexual gratification without DNA evidence of sexual intercourse, the government is correct that we are foreclosed from reviewing the sufficiency of the evidence before the grand jury.  See Kaley, 571 U.S. at 328.[10]

---

[10] In support of his Presentment Clause challenge, Coleman also cites a March 2019 statement from the then-U.S. Attorney that "it [did not] appear Correia was sexually assaulted."  This statement did not foreclose the government from arguing to the grand jury one month later that Coleman's purpose was sexual

But even assuming there was a variance, Coleman has not shown any prejudice. The record reflects that Coleman was aware well before trial that the government planned to introduce evidence that he sexually assaulted Correia. This topic came up repeatedly in pretrial motions and pretrial conferences with the district court. Coleman's well-developed arguments at trial to introduce evidence to show that any sexual encounter was consensual demonstrate that he was prepared for the government's theory.[11] On these facts, we cannot conclude that Coleman "was 'so in the dark about the' government's prosecution theory at trial that '[]he could not prepare a defense or plead double jeopardy to stop a second prosecution for the same crime.'" Katana, 93 F.4th at 537 (quoting Greaux-Gomez, 52 F.4th at 239).

## B. Motion to Suppress

Coleman next contends that the district court erred in denying his motion to suppress evidence obtained from several searches following his arrest. In his view, the warrants

---

gratification. The parties agree that the government had, at that point, evidence from the police investigation into Correia's disappearance, including video footage of Correia naked from the waist up when Coleman carried her from his car. We see no reason to conclude that the government could not have argued to the grand jury that Coleman's purpose was sexual gratification based on that evidence.

[11] Coleman separately argues that this evidence was erroneously excluded, an argument which we address below. See infra Section II.D.4.i.

supporting those searches did not establish probable cause. The challenged warrants authorized searches of Coleman's cellphone, records from his cellphone service provider, his Google account records, a laptop and computer tower seized from his car, and the vehicle information module for his car.

"We review de novo the district court's legal conclusion about whether a given set of facts amounts to probable cause." United States v. Gonzalez, 113 F.4th 140, 147 (1st Cir. 2024). "We view the facts in the light most favorable to the district court's ruling, but only to the extent they are not clearly erroneous." United States v. Rivera, 988 F.3d 579, 581 (1st Cir. 2021). In conducting that analysis, a court considers whether a warrant application contains sufficient information to "demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched -- the so-called 'nexus' element." Gonzalez, 113 F.4th at 148 (quoting United States v. Roman, 942 F.3d 43, 50 (1st Cir. 2019)).

"Probable cause exists when the totality of the circumstances suggests that there is a fair probability that" the crime occurred and "contraband or evidence of a crime will be found in a particular place." United States v. Francis, 132 F.4th 101, 107 (1st Cir. 2025) (internal quotation marks omitted) (quoting United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013)). "Fair

probability is less than a more-likely-than not standard," Gonzalez, 113 F.4th at 148, and always entails a "practical, common-sense decision," Francis, 132 F.4th at 107 (quoting United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015)). In our analysis, we "accord[] deference to the reasonable inferences that the issuing judge may have drawn." United States v. Sylvestre, 78 F.4th 28, 33 (1st Cir. 2023).

Coleman argued to the district court and re-urges on appeal that the warrant applications failed to provide sufficient information to establish probable cause as to both the commission and nexus elements. As we explain below, however, we agree with the district court that there was probable cause to believe Coleman kidnapped Correia and that evidence of that crime would be found in the documents and devices to be searched. Because we conclude there was probable cause, we do not reach the parties' arguments about the good-faith exception.

### 1. The Commission Element

The parties agree on appeal with the district court's assessment that "the issues [across the warrant applications] are essentially the same and intertwine and overlap to a great extent." They treat the affidavit submitted by FBI Special Agent Thomas Zukauskas in support of the cellphone warrant application as representative for the commission element. We do the same.

Special Agent Zukauskas described in detail law enforcement's investigation into Correia's disappearance, which led to Coleman's arrest on February 28, 2019. Because this detailed description overlaps substantially with our earlier description of the same events, we focus on the facts in the affidavit most pertinent to Coleman's suppression motion.

In his affidavit, Special Agent Zukauskas recounted the key events that occurred preceding the search. As he set out:

- Correia left the area outside of Venu at 2:16 a.m. on Sunday, February 24 with a man that law enforcement later identified as Coleman. Correia and Coleman walked to a red sedan, which Coleman drove into the parking lot of his Providence apartment building two hours later.

- After arriving at his apartment complex, Coleman carried a woman's limp, half-naked body out of his car and dragged it through the lobby of his building, into the elevator, and towards his apartment. From his review of photos and video, Special Agent Zukauskas believed it was Correia's body.

- Early on February 28, 2019, Coleman packed the same red sedan with several items, including a suitcase, and drove out of state. Later that day, Delaware State Police located and stopped Coleman in his vehicle. There were cracks in the vehicle's windshield on the passenger side.

- When asked if anyone else was in the vehicle, Coleman stated "she's in the trunk." Law enforcement conducted a sweep of the red sedan and found a dead body with significant bruising in a suitcase in the trunk. It appeared to be Correia. Coleman was taken into custody; he had a bandage on his face and when asked about it, he attributed the injury to "the girl."

- 32 -

Despite this detailed factual account, Coleman argues that the affidavit did not provide a substantial basis to conclude that there was probable cause to establish three of the necessary elements of kidnapping. In his view, the affidavit did not demonstrate that Correia was (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and (2) held for an appreciable period against her will (3) for ransom, reward, or otherwise. See 18 U.S.C. § 1201(a); Chatwin v. United States, 326 U.S. 455, 459-60 (1946).

Our review of the "totality of the circumstances as they are set forth in the warrant application" persuades us that there was sufficient information to demonstrate a fair probability that Coleman kidnapped Correia. United States v. Sheehan, 70 F.4th 36, 44 (1st Cir. 2023). Coleman contends the magistrate judge could not have concluded that a seizure and holding occurred because the affidavit describes Correia voluntarily walking to Coleman's car but does not describe what occurred between their departure from Boston and their arrival in Providence. But his view of the facts does not credit reasonable inferences that the magistrate judge could draw against him. See Sylvestre, 78 F.4th at 33. According to the affidavit, Correia was alive when she entered Coleman's car but was dead or unconscious two hours later when Coleman carried her limp body out of the car; her face was bruised; the windshield was cracked on the passenger side; and Coleman attributed an injury

- 33 -

on his face to Correia.  A permissible, common-sense inference from these facts is that a struggle occurred in the car, during which Correia was seized and held against her will.

We are also unconvinced by Coleman's claim that the affidavit provided no basis from which to conclude Coleman kidnapped Correia to "secure a benefit for himself."  This one-sentence argument is likely waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Regardless, the affidavit references evidence of a struggle in the car and the footage showing Correia naked from the waist up when Coleman carried her out of the car, which is enough to show a fair probability that Coleman held Correia for sexual gratification, to cover up a crime, or to prevent the reporting of a crime.  Any of these purposes would suffice to satisfy the broad language of the federal kidnapping statute.

### 2. The Nexus Element

Coleman also argues that the warrant affidavits did not establish probable cause to believe that evidence related to the crime would be found in the computer tower, laptop, and cellphone recovered from his car.  As we explain below, we disagree.

Because whether there was probable cause turns on the facts discussed in each warrant application, we begin with the overlapping facts.  According to the affidavits, Coleman packed his car in Providence in the early hours of February 28, drove out

- 34 -

of state, and was stopped and arrested by law enforcement later that day in Delaware.  Shortly after the stop, officers found Correia's dead body in his car.  Officers recovered the computer tower, laptop, and cellphone from the car,[12] as well as various other items, including long-handled loppers; a gas container and lighter; safety glasses; work gloves; pliers; and disinfectant wipes.

The affidavits described, based on the officers' experiences and training as FBI Special Agents, the potential evidentiary value of each item to be searched.  For example, in his affidavits supporting both the computer tower and laptop search warrant applications, Special Agent Brendan Fogerty stated that it was likely that these items contained evidence "of Coleman's planning and/or execution of the kidnapping," his plans to flee, and research about "various means of cleaning, transporting, and disposing of a human body and trace evidence."  As to the cellphone, Special Agent Zukauskas stated that it was likely to have evidence of the owner's "daily activities" and, more

---

[12] Regarding the cellphone, the affidavit stated that Coleman provided the number associated with the recovered cellphone as his home number during booking and that Coleman's social media accounts were connected to that cellphone.  In light of this evidence, we are not persuaded by Coleman's argument that there are no facts "from which to infer that Coleman had this cellphone, or any cellphone, with him during the alleged crime."  Even if he did not have that cellphone with him at the time of the crime, there was a fair probability that the cellphone had evidence related to his planning or his flight.

specifically, was likely used to "send or receive relevant emails and text messages; to set up or access relevant websites; and/or communicate with witnesses." Although we now know that Coleman and Correia first met on February 24, 2019, that fact was not known when the warrant was issued on March 12, 2019.

Coleman argues that the cellphone, laptop, and computer tower affidavits include only general statements about how people use those devices, and thus do not sufficiently link those items either to kidnapping or to the allegations in this case. But "[d]irect evidence is not necessary to ground a probable cause determination where, as here, the import of circumstantial evidence is obvious." United States v. Adams, 971 F.3d 22, 33 (1st Cir. 2020). Each warrant application was premised on the fact that Coleman was fleeing his home with a dead body and various items that could be used to dispose of a body and related evidence. In this context, as the district court noted, the "obvious inference from the fact that [Coleman] took [these items] with him on his flight is that there was something on [them] that he wished to hide." It was also reasonable to infer that Coleman would have researched how to dispose of the body or related evidence on each device based on the agents' statements in the affidavits.[13]

---

[13] Law enforcement sought and received warrants for associated records (i.e., cellphone records from Coleman's service provider and Google account records associated with Coleman's cellphone and

Coleman also cites our decision in <u>Roman</u> to support his point that general observations about the use of electronic devices are not sufficient to establish the nexus element. In <u>Roman</u>, we held that the affidavit contained no evidence tying the alleged crime to the place to be searched, and that the government's case "depend[ed] entirely on inferences made by [the DEA agent], drawn largely from" testimony found to contain material misrepresentations and omissions. <u>See</u> 942 F.3d at 50. There was no comparable lack of evidence here, and no allegations that the affidavit contained material misrepresentations and omissions.

## C. Voir Dire

We now turn to Coleman's claim related to jury selection. Coleman requested that the district court show all potential jurors one of two educational videos about implicit bias. The court denied that request, explaining that although the "concept underlying the video[s] is important," it would be better on balance to address concepts of "implicit bias, fairness, and listening to the evidence . . . orally, not through [the videos.]"

---

email address) on the basis that those records would contain relevant communications and location data. Coleman has not made an argument about those warrants separate from his argument about the warrants for his electronic devices. For the same reasons we find the nexus element satisfied to justify a search of Coleman's electronic devices, we find the nexus element satisfied to justify a search of the associated records.

We review the district court's voir dire decisions for abuse of discretion. See United States v. Parker, 872 F.3d 1, 6 (1st Cir. 2017). We reverse only if "our review of the record leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (quoting United States v. Gelin, 712 F.3d 612, 621 (1st Cir. 2013)). We find no abuse of discretion here.

In some circumstances, the Constitution requires the court to ask "special voir dire question[s]" to address "[t]he possibility of racial prejudice." United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991).[14] The parties dispute whether this case presents such circumstances. Coleman argues that the district court erred in characterizing this case as not "a particularly racially charged crime." He contends that race was fundamental to the case because he is a Black man who was tried before a jury with no Black jurors, and his efforts to flee the police and hide Correia's body were tied to his experiences as a Black man in the U.S. who had been beaten by police officers in

---

[14] In Brown, we pointed to two cases as examples of those circumstances: one "involv[ed] a black civil rights activist whose defense to a marijuana possession charge was that he had been framed by local white police" and one "involv[ed] [the] sentencing of a black defendant who had been convicted of a capital offense" for killing a white storekeeper. 938 F.2d at 1485 (citing Ham v. South Carolina, 409 U.S. 524 (1973), and Turner v. Murray, 476 U.S. 28 (1986)).

- 38 -

the past.  The government responds that because Correia and Coleman were both Black, there was no interracial perpetrator/victim dynamic, and that this case did not raise any other particular risk of racial prejudice.  The government also argues that the district court addressed the issue of potential racial prejudice through its jury instructions and the questions it posed to the jury, and that it articulated valid reasons to decline to show the videos that Coleman proffered.

The district court discussed the importance of impartiality with all prospective jurors, including the potential for racial prejudice.  It informed the prospective jurors that both Coleman and Correia were "African-American" and stressed that Coleman "must be considered as an individual . . . , not according to his ethnicity or race."  After providing that context, the court asked the prospective jurors if they "have any feelings of any kind that might affect [their] ability in any way to be fair and impartial in the trial of this matter."  In previous cases, we have ruled that similar questions sufficiently addressed racial bias.  See Parker, 872 F.3d at 5-7; cf. United States v. Casanova, 886 F.3d 55, 59-60 (1st Cir. 2018) (on plain error review, holding similar questions posed to the jurors as a group were sufficient "to safeguard [the defendant's] right to an impartial jury").

To be sure, the district court in Parker asked a total of three questions during voir dire targeting potential racial

bias, at defense counsel's request.  See 872 F.2d at 5-6.  Here, the district court asked only one question, but it did so immediately after addressing Coleman's race and highlighting that the jury should guard against the risk of racial bias influencing its decision-making.  We cannot conclude that it was "a clear error of judgment" for the district court to address the issue of racial bias in this manner, rather than by playing the videos submitted by Coleman.  Id. at 6.

Coleman also argues that the district court's statements that the videos were "distracting," "smug," and "condescending" indicate an abuse of discretion.  We disagree with Coleman's characterization of the record.  Coleman takes the court's statements out of context: the court acknowledged the "concept[s] underlying the video [are] important" but decided to address those concepts in a different way.  After the jury was empaneled, the court provided an instruction that demonstrated its recognition of the reality of prejudice, including prejudice "that we may not even be conscious of."  It stated:

> As I'm sure you know, when we get into issues of race or nationality or religion or gender, things can be very problematic indeed.  All of us do tend to think of other people as being part of one or more groups.  We all do it to some extent.  In a jury trial, that kind of thing, again, can be unfair and that's particularly dangerous if we're talking about things that are below the surface that we don't talk about openly or that we may not even be conscious of.

I don't need to tell you, I'm sure, that the defendant should be judged based on the evidence, not on his race or gender. But each of you should take extra care to make sure you're doing exactly that, that you're being as honest as you can with yourselves. If you hear yourself thinking inwardly that's what a typical man would do under these circumstances or, worse, a typical black man or a typical wom[a]n would do this or a typical black woman, stop yourself, catch yourself, think about what you're doing. Are you making a decision based on the evidence or something else?

I'm not saying it's easy to overcome your assumptions, again, the ones that you're not even thinking about, but it is your duty and responsibility to be as fair as you can and to decide the case based on the evidence and not according to generalized assumptions that you may have.

Citing several law review articles, Coleman sought to have the district court specifically address implicit bias, arguing that education can mitigate the impact of implicit bias and that such education should cover that "implicit bias exists, it is normal, and it operates without awareness." The district court's instruction did not use the term "implicit bias," but it addressed the central idea Coleman urged the court to highlight: that each juror should be aware of prejudice "below the surface." We conclude the district court did not abuse its discretion in addressing potential racial bias in this manner.

## D. The District Court's Evidentiary Rulings

Coleman also challenges four of the district court's evidentiary rulings. Namely, (1) the denial of his pretrial motion

- 41 -

to preclude the government from using the term "sexual assault"; (2) the admission of evidence regarding Correia's plans to pick up her daughter; (3) the exclusion of expert testimony by Dr. Jeffrey Fagan; and (4) the exclusion of evidence of Correia's alleged prior sexual and violent conduct.

Generally, "[w]e review the district court's rulings on whether to admit or exclude evidence, including rulings on motions in limine, for abuse of discretion." United States v. Brown, 510 F.3d 57, 66 (1st Cir. 2007). "[A]n abuse of discretion occurs when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." Id. at 67 (quoting United States v. Frabizio, 459 F.3d 80, 91 (1st Cir. 2006)). We review de novo Coleman's constitutional claim that the court's exclusion of evidence about Correia's prior conduct infringed his right to present a defense. See United States v. Brown, 669 F.3d 10, 19 (1st Cir. 2012).

We conclude that the district court did not abuse its discretion as to any of the challenged evidentiary rulings. We further determine that excluding evidence of Correia's prior conduct did not infringe Coleman's right to present a defense.

**1. Denial of Motion to Preclude the Government from Using the Phrase "Sexual Assault"**

Coleman contends that the district court abused its discretion when it denied his motion to preclude the government and its witnesses from using the term "sexual assault" at trial. He argues that allowing the government to use this term was unfairly prejudicial and invaded the province of the jury to decide whether Coleman had in fact kidnapped Correia for sexual gratification.[15]

In its ruling on Coleman's motion, the district court explained that the government planned to introduce evidence that sexual intercourse occurred and that, "under the circumstances[,] it [was] not unfair for the government to use the term 'sexual assault.'" The court pointed to Correia's "very high level of intoxication, at least measured by her . . . blood alcohol level and [the fact] that a violent struggle took place in the car." In

---

[15] We bypass the government's point that Coleman did not object to the use of the term "sexual assault" during trial. As the government acknowledges, although a defendant must ordinarily "object to particular evidence at trial in order to preserve his appellate rights," "when a defendant raises such an objection before trial by a motion in limine and the district court's rejection of the defendant's position is unconditional, the defendant's objection may be deemed preserved even if not raised again at trial." United States v. Encarnacion, 26 F.4th 490, 503-504 (1st Cir. 2022) (citations omitted). We need not decide whether the rejection of the defendant's position was unconditional here, because we conclude that the district court did not abuse its discretion in allowing the government to use the term "sexual assault."

light of this evidence, the court concluded that the term "sexual assault" was not unfair or inflammatory.  We see no error of judgment in this analysis.

Nor do we think the district court's ruling invaded the province of the jury.  Coleman argues that by using the term "sexual assault," the government and its witnesses "presented nonconsensual sex as a fact" and this amounted to offering an opinion on the "ultimate issue[]" of Coleman's purpose, an element of the crime.  The only witnesses to use the term "sexual assault" were Dr. Vershvovsky and a forensic examiner, who both used the phrase in their discussions of the "sexual assault kit" samples collected from Correia's body.  Dr. Vershvovsky also testified that the lack of injury to Correia's vaginal area did not rule out that sexual assault occurred.  Each side argued as to whether the evidence was consistent with sexual assault.  More significantly, whether sexual assault occurred was not the ultimate issue before the jury.  Rather, the ultimate issue was whether Coleman kidnapped Correia for sexual gratification.  Based on this record, we conclude that neither the government nor its witnesses presented sexual assault as a fact, and that it remained up to the jury to decide the ultimate issue of whether the purpose element was satisfied.

## 2. Admission of Testimony Regarding Correia's Plans to Pick Up Her Daughter

The government filed its own motion, seeking to introduce at trial statements Correia made to others about her plans for the weekend of February 23, 2019, including statements to her case worker at the shelter where she lived and to her daughter's grandmother. The government argued that these statements were non-hearsay evidence of Correia's state of mind and intent to pick up her daughter and return to the shelter by late afternoon on Sunday, February 24. Coleman opposed the motion, contending that Correia's statements were not relevant under Federal Rule of Evidence 401 and, even if they were, the court should exclude them under Federal Rule of Evidence 403 because the risk of unfair prejudice substantially outweighed their probative value.

The district court granted the government's motion, subject to certain limits. "[I]n order to avoid any potential improper appeal to sympathy or bias," the court prohibited the government from "elicit[ing] information concerning (1) the nature of the shelter in which the victim was residing, or the reason she was residing there, or (2) the name of the victim[']s child, or any other details concerning the child." The trial witnesses testified within these limits. Correia's case worker, Loveth Anumele, testified that Correia lived in a shelter in Lynn with

- 45 -

her daughter and that Correia had received a pass to be away from the shelter until 5:00 p.m. on Sunday, February 24. Correia's daughter's grandmother, Rosina Castro, testified that she was watching her granddaughter that weekend and that Correia had arranged to pick her up on Sunday.

Coleman argues that the district court abused its discretion by admitting Anumele's and Castro's testimony because their testimony "had no relevance but was calculated to make Correia more sympathetic." "Evidence is relevant as long as it has some tendency to make a fact of consequence more or less probable." See United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019) (citing Fed. R. Evid. 401).

Here, Correia's Sunday plans were relevant because they made it more likely that she intended to stay in Massachusetts after she left Venu, and to return to Mondesir's apartment, where she had left her housekeys. In the mosaic of this case, the statements thus could have helped the jury evaluate whether Coleman deceived Correia by offering her a ride to Mondesir's apartment, as the government claimed. The district court's instruction that the government omit details about Correia's daughter and about the shelter where they lived mitigated the potential for unfair prejudice.[16] Especially because the jury had only circumstantial

---

[16] Correia lived in an emergency assistance housing shelter for victims of domestic violence.

evidence about what transpired during the critical minutes between 2:16 a.m. and Correia's death, the district court did not abuse its discretion in ruling that the risk of unfair prejudice did not substantially outweigh the probative value of the admitted evidence.[17]

Coleman cites our opinion in Kilmartin to support his claim that, even if the evidence were relevant, the district court should have excluded it under Rule 403; however, that case is distinguishable. In Kilmartin, we held that the district court abused its discretion when it admitted testimony from several of the defendants' alleged victims, as well as copious emails between the defendant and the victims, as evidence of a fraud scheme that targeted suicidal individuals. See 944 F.3d at 335-37. The "testimony went into excruciating detail about the . . . victims' personal lives, medical issues, histories of depression, earlier

_____

[17] Coleman argues that Correia's Sunday plans were not relevant because her plans were not incompatible with accepting a ride from him and having consensual sex with him. We certainly do not mean to overstate the probative value of the admitted testimony. That said, given that there is no direct evidence of what Correia and Coleman said to each other outside of Venu, we conclude that her Sunday plans made it at least somewhat more probable that their brief conversation was about him giving her a ride to Mondesir's apartment. The government's theory was that this offer was deceptive because his intent was to have sex with Correia, as we discuss in more detail below. See infra Section II.G.1.i. And, although Coleman argues that evidence about Correia's Sunday plans was not relevant because he did not contest her intent to return home on Sunday, he did arguably contest that was her intent when he elicited testimony from Hiltz that Correia would sometimes "go off with someone for a few days."

suicide attempts, suicidal motivations, and the like." Id. at 335. We described the emails as "likely to evoke an emotional response in even the most hardened individuals." Id. at 337. Finding that this evidence "added virtually nothing of legitimate value to the government's case," we explained that "just because evidence may have a smidgen of probative value, that bare fact does not give the government free rein to capitalize upon its emotionally laden content." Id. By contrast, Anumele's and Castro's trial testimony was brief and specifically framed to avoid details that would stir the jury's emotions.

### 3. Exclusion of Dr. Fagan's Expert Testimony

To support his argument that he fled the police out of fear, rather than consciousness of guilt, Coleman sought to introduce two types of evidence at trial: facts indicating that police had assaulted him in 2013 and expert testimony by Dr. Fagan. In describing Dr. Fagan's testimony, Coleman explained that he intended to call him as an expert who would "explain empirical studies showing that the impacts of threatening police interactions . . . include fear of bodily harm and possibly death."

The government urged the district court to exclude both types of evidence. As to Dr. Fagan's testimony, it argued that Coleman's expert disclosure was insufficient under Federal Rule of Criminal Procedure 16(b)(1)(C), and thus neither the court nor the

government could assess whether the testimony met the requirements of Federal Rule of Evidence 702 (the expert witness rule) and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), which set the standard for evaluating if an expert's methodology is reliable.

The district court permitted Coleman to introduce evidence of the 2013 assault by the police, but it excluded Dr. Fagan's testimony under Rules 702 and 403 of the Federal Rules of Evidence, as well as Rule 16 of the Federal Rules of Criminal Procedure. Coleman contends that the court abused its discretion in excluding Dr. Fagan's testimony.

We begin by reviewing the district court's conclusion that Dr. Fagan's opinion testimony was inadmissible under Federal Rule of Evidence 702. We note that the court's analysis of Rule 702 overlapped with its analysis under Federal Rule of Criminal Procedure 16, as the court explained that the insufficient disclosure made it impossible to assess the reliability of Dr. Fagan's methodology.

Under Rule 702, a qualified expert may testify in the form of an opinion if four requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. And under Daubert, courts consider the following nonexclusive factors to determine whether an expert's methodology is reliable: (1) "whether [the theory or technique] can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of a particular scientific technique; and (4) whether the methodology has been generally accepted by the relevant scientific community. 509 U.S. at 593-94. Coleman had the burden of demonstrating the admissibility of Dr. Fagan's expert opinion. See United States v. Tetioukhine, 725 F.3d 1, 6 (1st Cir. 2013).

Before issuing its ruling on Dr. Fagan's testimony, the district court put Coleman on notice at a motion hearing and at the pretrial conference that it had concerns with Dr. Fagan's minimal expert disclosure. That initial disclosure provided only Dr. Fagan's curriculum vitae and a two-sentence description of his testimony. The court made clear that Dr. Fagan's "credentials and his opinion with nothing else in between" were insufficient to "indicate what the basis of [his] opinion is." It also had "concerns about the methodology from a Daubert standpoint." In

response to the court's concerns, Coleman provided the government with a supplemental disclosure. He again included only a two-sentence description of Dr. Fagan's testimony.[18] He also specified the 17 articles that Dr. Fagan was relying on to form his opinion and provided a one-sentence summary of each article.

On this record, Coleman has not demonstrated that the district court abused its discretion in excluding Dr. Fagan's testimony under Rule 702. Although the court put Coleman on notice of its concerns that he had insufficiently explained the basis of Dr. Fagan's opinion, Coleman provided only a minimal supplemental disclosure. There was no expert report or affidavit from Dr. Fagan explaining the reasons for his opinion or describing accepted methodologies in his field or the methodologies of the disclosed articles. As the district court explained, it was "impossible for [the court] to assess even what the precise opinion is, what the methodology is." As to the disclosure of "various studies," the district court had no way to "know how to assess them" because it

---

[18] The summary stated:

> Professor Fagan may testify that the impacts upon Black persons of involuntary police confrontation, false accusations by police, and threatening police behavior extend beyond liberty interests to include the fear of grievous bodily harm and possibly death. Professor Fagan may also testify that fear, anxiety, and impaired perception and social judgement occurs so that flight may be unrelated to consciousness of guilt.

did not know "how they were conducted," "what data they're based on, what principles they involved, whether they were reliable principles, reliably applied and all the rest of it."[19]

Coleman attempts to transform the district court's ruling into a rejection of social science research generally, but the court made no such sweeping ruling. Rather, it concluded, based on the particular expert disclosure before it, that Coleman failed to meet his burden to show that Dr. Fagan's opinion was based on valid and reliable studies accepted in his field.

In light of the thin disclosure, the district court did not abuse its broad discretion in exercising its "gate-keeping role" to ensure an expert's testimony "rests on a reliable foundation" under Rule 702 and Daubert. United States v. Vargas, 471 F.3d 255, 261 (1st Cir. 2006) (citation omitted). Because we find no error in the district court's ruling to exclude Dr. Fagan's testimony under Rule 702 and Daubert, we do not reach its ruling that Dr. Fagan's testimony also was inadmissible under Rule 403.

**4. Exclusion of Specific Instances of Correia's Prior Conduct**

Coleman filed two motions to introduce at trial evidence of Correia's prior conduct, relying on Federal Rules of Evidence

---

[19] Our own review of Dr. Fagan's disclosure confirms the district court's assessment that the limited disclosure does not explain how Dr. Fagan relied on various articles to form an opinion potentially relevant to this case. It was Coleman's burden to connect the dots.

404(b) and 405(a)-(b), which govern the use of character evidence, and his constitutional right to "a meaningful opportunity to present a complete defense."[20]  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).  One motion related to Correia's prior sexual behavior. The other related to what Coleman claimed was Correia's character for violence, particularly when she was drinking.[21]  The arguments in the two motions overlapped because one of the specific instances of violence that Coleman sought to introduce related to Correia's prior sexual conduct -- we refer to that proffered evidence as the "Atlanta incident."  Coleman claimed that this evidence was necessary to rebut the government's theory that Coleman kidnapped Correia for sexual gratification and to support his theory that they had consensual sex, Correia later became violent, and an unexpected struggle ensued that caused her death.

The district court allowed Coleman to attempt to elicit "reputation testimony" from Mondesir that Correia "engaged in acts of prostitution as needed," on the ground that such evidence would further Coleman's right to a fair trial.  It also allowed in

---

[20] Because the relevant motions and proffers were filed under seal in the district court and the parties' briefing about these motions was filed under seal in this court, we do not discuss the specifics of the alleged prior conduct.

[21] The first pretrial motion addressed several categories of character evidence.  We focus only on the character evidence claim that Coleman pursues on appeal.

reputation testimony about Correia's alleged violence when drinking, as well as testimony about at least one specific instance of violence.[22]  But the court excluded evidence of specific instances of Correia's prior sexual behavior, including the Atlanta incident, under Federal Rules of Evidence 412 and 403.

As a reminder, we review the district court's evidentiary rulings for abuse of discretion.  See Brown, 510 F.3d at 66.  We review Coleman's preserved constitutional challenge de novo.  See Brown, 669 F.3d at 19.

### i. Exclusion of Correia's Prior Sexual Conduct

Coleman argues that the district court's ruling excluding specific instances of Correia's prior sexual behavior was wrong, both under the relevant rules of evidence and because it violated his Sixth Amendment right to present his defense.  See United States v. Rosario-Pérez, 957 F.3d 277, 293 (1st Cir. 2020) ("The Sixth Amendment guarantees criminal defendants the right to present a defense . . . ." (quoting United States v. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997)));  see also Holmes, 547 U.S. at 324.  In particular, he identifies three specific pieces of evidence that he contends should have been admitted: (1) testimony about

---

[22] We use the term "violence" to be consistent with Coleman's pretrial motion. At trial, however, the relevant witness testified that Correia became "messy" when drunk but denied that Correia started fights. She also testified that Correia attempted to break up a fight when asked to recount a specific instance in which Correia was allegedly fighting when drunk.

the Atlanta incident; (2) text messages between Correia and Mondesir about her activity on February 23, 2019; and (3) documents related to Correia's sexual conduct in 2013 and 2014.

We begin by evaluating the district court's ruling excluding such evidence under Federal Rule of Evidence 412. Subject to limited exceptions, Rule 412 provides that "evidence offered to prove that a victim engaged in other sexual behavior[] or evidence offered to prove a victim's sexual predisposition" "is not admissible in a . . . criminal proceeding involving alleged sexual misconduct." Fed. R. Evid. 412(a)-(b).

Coleman intended to introduce evidence of Correia's prior sexual conduct to argue that she consented to have sex with him. In his view, the excluded evidence was essential to rebut the government's sexual assault theory because it helped to explain why Correia may have provided consent.

But as the district court correctly concluded, the plain language of Rule 412 states that evidence of Correia's "other sexual behavior" was not admissible at trial. See Fed. R. Evid. 412(a). The commentary to Rule 412 confirms that conclusion. See In re Kirkland, 75 F.4th 1030, 1043 (9th Cir. 2023) ("We may look to the advisory committee's notes because they 'provide a reliable source of insight into the meaning of a rule.'" (quoting United States v. Vonn, 535 U.S. 55, 64 n.6 (2002))); Tome v. United States, 513 U.S. 150, 167-68 (1995) (Scalia, J., concurring)

- 55 -

("[T]he Notes are . . . ordinarily <u>the</u> most persuasive" authority on the meaning of the rules, although they cannot change the meaning of the text). Indeed, the commentary specifically contemplates that Rule 412 could apply in a kidnapping case. It states:

> The strong social policy of protecting a victim's privacy and encouraging victims to come forward to report criminal acts is not confined to cases that involve a charge of sexual assault. The need to protect the victim is equally great when a defendant is charged with kidnapping, and evidence is offered, either to prove motive or as background, that the defendant sexually assaulted the victim.

Fed. R. Evid. 412 advisory committee's note to 1994 amendment. Thus, the evidence was clearly inadmissible under Rule 412 unless it fit within an exception.

One of the limited exceptions to Rule 412 in criminal cases is for "evidence whose exclusion would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C). "The constitutional exception under Rule 412(b)(1)(C) protects, in part, defendants' 'constitutional right under the Fifth and Sixth Amendments to introduce evidence in their defense.'" <u>United States</u> v. <u>Brandon</u>, 64 F.4th 1009, 1016 (8th Cir. 2023) (quoting <u>United States</u> v. <u>Pumpkin Seed</u>, 572 F.3d 552, 559-60 (8th Cir. 2009)), <u>cert. denied</u>, 144 S. Ct. 514 (2023). Coleman argues that the district court should have applied this exception because

evidence of Correia's prior sexual conduct "countered the government's narrative of a planned sexual assault and made Coleman's theory of defense more likely."

We have recognized that the evidentiary rules must give way to the Constitution, when needed. See Rosario-Pérez, 957 F.3d at 294 ("Where the stakes are very high, it is a court's job to make sure that the rules themselves are not made an instrument of injustice."). That said, the constitutional right to "a meaningful opportunity to present a complete defense" does not guarantee Coleman "an unfettered right to offer testimony that is incompetent, privileged, or otherwise [inadmissible] under standard rules of evidence." Brown, 669 F.3d at 19 (first quoting Brown v. Ruane, 630 F.3d 62, 71 (1st Cir. 2011); then quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)); see also United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011) ("[T]he right to present a defense does not trump valid rules of evidence.").

In prior cases, we have used the relative probative value of evidence as a benchmark for whether the Constitution requires its admission in the Rule 412 context, holding that a court need not admit evidence that is marginally relevant. See United States v. Gemma, 818 F.3d 23, 34 (1st Cir. 2016) (evidence of a trafficking victim's prior prostitution "is either entirely irrelevant or of such slight probative value in comparison to its prejudicial effect that a decision to exclude it would not violate

[the defendant's] constitutional rights"); <u>Greaux-Gomez</u>, 52 F.4th at 436 (constitutional exception to Rule 412 did not apply, even assuming evidence of the victim's prior sexual conduct was relevant for impeachment, because "any probative value of the evidence was substantially outweighed by the danger of unfair prejudice"). Our sister circuits have likewise concluded that the exclusion of evidence under Rule 412 does not violate a defendant's constitutional rights when that evidence has little or no relevance or when its relevance is outweighed by the risk of unfair prejudice. <u>See, e.g.</u>, <u>United States</u> v. <u>Elbert</u>, 562 F.3d 771, 777 (8th Cir. 2009); <u>United States</u> v. <u>Haines</u>, 918 F.3d 694, 697 (9th Cir. 2019); <u>United States</u> v. <u>Powell</u>, 226 F.3d 1181, 1199 (10th Cir. 2000).

Here, the probative value of specific instances of Correia's prior sexual conduct was minimal. Coleman argued that the excluded evidence was critical in part because it went to "whether there was consent, when there was consent, and what that looked like." But the excluded evidence concerned situations that were meaningfully different from the interaction between Coleman and Correia, either because the prior situations involved individuals Correia already knew, rather than a stranger like Coleman, or because they occurred when Correia was a juvenile. By comparison, the risk of prejudice was significant. Rule 412 exists in part because stereotypes about sexually active women are

prevalent.  See Fed. R. Evid. 412 advisory committee's note to 1994 amendment; see also Gemma, 818 F.3d at 35 (evidence offered to show a victim acted consistently with prior sexual behavior "falls squarely within a class deemed so extremely prejudicial as to warrant special treatment under the Federal Rules of Evidence").[23]

The parties discuss three decisions from the U.S. Court of Appeals for the Eighth Circuit addressing the constitutional exception to Rule 412 in criminal cases, but none of those decisions suggest that the district court erred in excluding the evidence at issue here.  Two cases involved aggravated sexual assault charges, where the victims had suffered recent sexual assaults by other perpetrators.  In United States v. Bear Stops, the Eighth Circuit found that evidence of the previous sexual assault was necessary to provide an alternative explanation for the victim's bloody underwear, which was found close in time to the previous assault, and to provide context for testimony that the victim was experiencing symptoms of sexual abuse.  See 997 F.2d 451, 454-457 (8th Cir. 1993).[24]  Similarly, in United States

---

[23] We note that the excluded evidence was not "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct," which can be "offered by the defendant to prove consent" under another exception to Rule 412.  Fed. R. Evid. 412(b)(1)(B) (emphasis added).

[24] At the time that Bear Stops was decided, Rule 412 had an exception for evidence of "past sexual behavior with persons other

- 59 -

v. _Zephier_, the Eighth Circuit held that admitting evidence of a prior sexual assault was necessary to counter expert testimony that the victim's behavioral issues were "consistent with how rape victims often respond" to rape.  989 F.3d 629, 636 (8th Cir. 2021).

The third case, <u>United States</u> v. <u>Brandon</u>, is most relevant here, and the Eighth Circuit held that the district court did not need to admit evidence of the victim's prior prostitution under Rule 412's constitutional exception.  <u>See</u> 64 F.4th at 1019. In <u>Brandon</u>, the defendant sought to offer evidence of the victims' prior prostitution as an "alternative theory of the case to explain" evidence matching his DNA to one of the victim's vaginal swabs.  <u>See</u> <u>id.</u> at 1015.  "Given the speculative nature of [the defendant's] theory," the Eighth Circuit found that the district court had not erred by excluding the evidence of prior prostitution.  <u>Id.</u> at 1019.  It reasoned that the exclusion "was not arbitrary or disproportionate to the purposes served by

than the accused" "offered by the accused on the issue of whether the accused was or was not the source of injury."  997 F.2d at 454 n.2 (citing Fed. R. Evid. 412(b)(2)(A)).  The Eighth Circuit declined to apply the source-of-injury exception because it determined that the constitutional exception applied and prior Eighth Circuit case law limited the injury exception to cases in which emotional injuries were accompanied by "cognizable physical consequence."  <u>Id.</u> (quoting <u>United States</u> v. <u>Shaw</u>, 824 F.2d 601, 603 n.2 (8th Cir. 1987)).  The 1994 Amendments to Rule 412 broadened that exception, allowing the defendant to offer "evidence of specific instances of a victim's sexual behavior . . . to prove that someone other than the defendant was the source of semen, injury, or <u>other physical evidence</u>."  Fed. R. Evid. 412(b)(1)(A) (emphasis added).

exclusion, including avoiding further embarrassment and harassment of the victims, avoiding possible confusion of the issues by the jury, and preventing a 'thinly-veiled attack on [the victims'] general credibility.'"  Id. (quoting Pumpkin Seed, 572 F.3d at 560).

Whereas the defendants in Bear Stops and Zephier sought to introduce evidence that was directly related to who was responsible for the sexual assaults on the victims, the defendant in Brandon sought to introduce evidence that would bolster a highly speculative theory for why the evidence of sexual contact between him and the victim did not demonstrate an "assault" at all. Coleman likewise sought to introduce evidence of Correia's prior sexual conduct to bolster his theory that his sexual contact with Correia was consensual, and accepting his theory required the jury to make several inferential leaps.  Given the narrowness of the exceptions to Rule 412, the district court properly excluded that evidence.

Looking beyond the Rule 412 context, Coleman cites our prior decisions in Rosario-Pérez and United States v. Mulinelli-Navas, 111 F.3d 983 (1st Cir. 1997), for the proposition that he had the constitutional right to rebut the government's argument that he sexually assaulted Correia.  But neither of those cases presented the question of whether the Constitution requires otherwise inadmissible evidence to be admitted to rebut the

- 61 -

government's theory at trial.  And, like in Bear Stops and Zephier, the excluded evidence in those cases directly related to who was responsible for the alleged crime.  In Rosario-Pérez, we found that the district court had erred in making two of its evidentiary rulings, both of which related to evidence that someone other than the defendant had shot and killed a victim.[25]  See 957 F.3d at 290-94.  Having found both rulings independently erroneous, we determined that the cumulative prejudicial effect required reversal and a new trial.  See id. at 294.  In that context, we explained that "under the Constitution or, failing that, the court's supervisory power to make the rules of evidence just and fair in application, [the defendant] must be permitted to offer evidence to show that he did not commit the murder."  Id.  In Mulinelli-Navas, we held that the district court had erroneously prevented the defense from asking certain questions on cross-examination, which would have supported the defendant's theory that someone else was responsible for the fraud with which she was charged.  See 111 F.3d at 991-92.  We explained that the district court had exceeded its power to limit cross-examination and violated the defendant's Sixth Amendment right to

_____

[25] The government had been allowed to introduce testimony that the defendant shot and killed "Teton," a drug seller that reported to the defendant, as evidence to satisfy the overt act element of the charged drug conspiracy.  See Rosario-Pérez, 957 F.3d at 289. The excluded testimony was offered to show that someone else was responsible for Teton's murder.  See id. at 290.

confrontation by preventing the defendant from introducing "<u>any</u> testimony to support [her] theory of defense."  <u>Id.</u> at 992. Neither case suggests that the Constitution requires the admission of marginally probative and otherwise inadmissible evidence.

Because all the proffered evidence was inadmissible under Rule 412, we do not reach the district court's alternative ruling excluding the evidence under Rule 403.  We also do not need to reach Coleman's argument that the proffered evidence about the Atlanta incident was admissible under Rules 404(b) and 405(b).  As the government points out, the commentary to the rules makes clear that "[e]vidence, which might otherwise be admissible under Rules . . . 404(b) [and] 405 . . . must be excluded if Rule 412 so requires."  Fed. R. Evid. 412 advisory committee's note to 1994 amendment; <u>see also</u> Fed. R. Evid. 404 advisory committee's note to the 2000 amendment (noting the amendment does not affect "the standards for proof of character by evidence of other sexual behavior or sexual offenses under Rules 412-415.").[26]

---

[26] Coleman also argues that testimony about the Atlanta incident could have come in without reference to the sexual conduct.  But he has developed no argument about its relevance to his defense without those details.  Thus, we deem this argument waived.  <u>See</u> <u>Zannino</u>, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## ii. Exclusion of Correia's Prior Acts of Violence

In his pro se brief, Coleman also argues that the district court erroneously excluded evidence of an altercation between Correia and the father of her child, Miguel Castro. He contends that this evidence supported his theory that Correia initiated a fight with him in his car, resulting in her death.

After carefully reviewing the record, we conclude that Coleman never attempted to introduce this evidence. The district court initially deferred ruling on Coleman's pretrial motion related to Correia's alleged character for violence. During the trial, it allowed in "opinion evidence concerning her propensity for violence" but indicated it was still deciding whether to allow in "specific acts of violence." In response, Coleman argued that Mondesir should be allowed to testify about certain texts and the Atlanta incident because that evidence was admissible. He did not mention the incident between Correia and Castro. Later discussions of the outstanding evidentiary issues also did not touch on the Castro incident. Additionally, although Coleman filed a proffer regarding the text messages and the Atlanta incident and a supplemental memorandum to admit medical documents that he claimed showed Correia's violent character, we see nothing in the record to indicate that he submitted a similar motion related to the incident between Correia and Castro. Because Coleman failed to preserve this issue at the district court, we do not reach it on

appeal.  See Zhou v. Desktop Metal, Inc., 120 F.4th 278, 287-88 (1st Cir. 2024).

### E. The District Court's Other Trial Rulings

Coleman raises two additional challenges to the district court's rulings during trial.  First, he appeals the court's denial of his motion for a mistrial over Dr. Vershvovsky's testimony.  Second, he argues that the court made multiple errors in how it treated Mondesir's testimony towards the end of trial.  For example, he contends that the court should not have permitted Mondesir to invoke her Fifth Amendment right not to testify and should have allowed him to question her about some of her previous statements.  In his view, the cumulative impact of these errors amounted to a violation of his Sixth Amendment right to present a complete defense.

We review the district court's ruling to deny Coleman's motion for a mistrial and to exclude evidence for abuse of discretion.  See Brown, 510 F.3d at 66; United States v. Apicelli, 839 F.3d 75, 86 (1st Cir. 2016).  "When a district court rules favorably on a witness's invocation of h[er] Fifth Amendment right, we [also] review its ruling for abuse of discretion."  United States v. Forty-Febres, 982 F.3d 802, 807 (1st Cir. 2020).  We review Coleman's other constitutional challenges de novo.  See Brown, 669 F.3d at 19.

After careful consideration, we find no error or abuse of discretion in the district court's rulings on these issues.

## 1. Dr. Vershvovsky's Testimony

Coleman appeals the denial of his motion for a mistrial in response to Dr. Vershvovsky's testimony that Correia was alive when Coleman carried her body into his lobby in the early hours of Sunday, February 24.

"Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." Apicelli, 839 F.3d at 86 (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 306 (1st Cir. 2014)). We consider three non-exhaustive factors in making this determination: "1) whether an appropriate curative instruction was issued, 2) whether the judicial response was timely, and 3) whether appellants successfully rebutted the presumption that the jury followed the judge's instructions." Id. (quoting United States v. Pagán-Ferrer, 736 F.3d 573, 586 (1st Cir. 2013)).

We begin by setting out the context for Dr. Vershvovsky's testimony. Before trial, the government disclosed that it would call Dr. Vershvovsky, the medical examiner who performed the autopsy on Correia's body. It also disclosed that Dr. Vershvovsky would opine that Correia's death resulted from strangulation and

that "it [was] not possible to determine with precision the date or time of Ms. Correia's death."  At trial, Dr. Vershvovsky testified as follows:

> Q: When you viewed the video of Ms. Correia being dragged inside the building, were you able to make a determination as to whether she was alive or dead at that point?
>
> A: I think she was alive.
>
> Q: What is the basis for that opinion?
>
> A: Because at first she has absolutely no injuries.  I think she was intoxicated but alive.

Coleman made a contemporaneous objection to Dr. Vershvovsky's unanticipated testimony, which the court overruled. Coleman then asked to be heard at the end of the government's direct examination.  He explained that the government had not disclosed that Dr. Vershvovsky would testify that Correia was still alive while she was in his apartment, and, as a result, he was not prepared with rebuttal testimony on this issue.  The government admitted that it too was surprised by this aspect of Dr. Vershvovsky's testimony, but that the testimony did not contradict her expert disclosure.  The government further argued that Dr. Vershvovsky "is subject to cross-examination on that topic" and that there was still time for the defense to identify and present "an additional expert."

The district court agreed with Coleman that this aspect of Dr. Vershvovsky's testimony impermissibly exceeded the scope of

her expert disclosure and struck that testimony when the jury returned from its break. The court also provided a curative instruction. The government did not object to striking the testimony or to the curative instruction. Unsatisfied with this remedy, Coleman moved for a mistrial on the basis that the testimony was so prejudicial that a curative instruction was insufficient. The court denied that motion.

We find no abuse of discretion in the district court's ruling to deny a mistrial over Dr. Vershvovsky's testimony. That ruling is sound under all three factors we consider in such circumstances. See Apicelli, 839 F.3d at 86. To begin, the court issued a curative instruction, stating:

> Before we begin the cross-examination, the witness issued or made a statement concerning whether the victim was alive or dead at the moment that she was taken out of the car and into the apartment shown on the video.
>
> I am going to strike that from the record and instruct you to disregard it. And when I say disregard it, that means it's not part of the evidence in this case, that you may not consider it in any way directly or indirectly in your consideration of the evidence in this case.

As to the substance of the instruction, Coleman's only argument on appeal is that the court did not explain why it struck the testimony, leaving potential for confusion. But Coleman never asked the court to include an explanation. Cf. Apicelli, 839 F.3d at 87 (court gave additional requested instruction not to draw a

prohibited conclusion).  Thus, we see no basis for concluding the instruction was inappropriate.

The instruction was also prompt.  The district court acted quickly after hearing Coleman's argument on this issue, providing the curative instruction only about 30 minutes after the challenged testimony.

Finally, Coleman has not shown that Dr. Vershvovsky's testimony was so inflammatory that "responsible jurors w[ould] not be able to put the testimony to one side" despite being instructed to do so.  Sepulveda, 15 F.3d at 1185; see also id. (we "start with a presumption that jurors will follow a direct instruction to disregard matters improvidently brought before them").  Coleman argues that Dr. Vershvovsky's testimony was extremely prejudicial because the jury must have relied on it to conclude that he held Correia during the car ride and in his apartment, satisfying the appreciable hold element.  At closing, however, the government argued that Coleman strangled Correia in the minutes they were together in his parked car on Tremont Street, and that he avoided the police on the one-way street because "by [that] time he had a dead body in the seat right next to him."  Coleman fails to explain why the jury would have dwelled on testimony that the district court promptly instructed it to disregard instead of accepting the

government's theory at closing that he killed Correia in his car.[27] And, for the reasons we explain below, see infra Section II.F.2, the evidence was sufficient for the jury to find an appreciable hold under the government's theory of the case. Thus, we conclude that the district court did not abuse its discretion in denying Coleman's motion for a mistrial as to Dr. Vershvovsky's testimony.

## 2. Mondesir's Testimony During the Defense's Case

We next turn to Coleman's challenges to the district court's rulings during Mondesir's testimony close to the end of trial. As a reminder, Mondesir initially testified during the government's case. But based on the court's decision that Coleman could introduce reputation testimony about Correia's alleged sex work, Coleman recalled Mondesir during his case. Coleman expected Mondesir to testify consistently with statements she had provided to the police during its investigation of Correia's death.[28]

Mondesir's second appearance on the witness stand was chaotic. When Coleman asked whether Mondesir was back in court voluntarily and whether she had refused to speak with his counsel,

---

[27] Indeed, the government's disavowal of Dr. Vershvovsky's statement could have led the jury to doubt other aspects of her testimony and thus could have been detrimental to the government's case.

[28] Because Mondesir's statements to the police are not part of the public record in this case and were filed under seal in our court, we do not recount them in detail. We describe only one statement, which Coleman asked Mondesir about during trial.

Mondesir responded "[w]hy would I want to talk to you? Why are you dragging me back here to answer questions that has nothing to do with nothing? He killed her. It doesn't matter what you ask me. It doesn't matter." When defense counsel then asked whether Correia had worked as a prostitute on the days immediately prior to her death, Mondesir responded "[a]re you kidding me?" and "[w]hat the fuck you looking at?" (We believe this second comment was directed at the defendant, not his counsel.) After being asked the same question again, Mondesir simply responded "no." Defense counsel then tried to refresh Mondesir's memory as to her interview with the police. At that point Mondesir asked why she was back on the stand and explained how detrimental the proceeding was to her mental health. The district court instructed defense counsel to wrap up, and counsel asked whether Mondesir told the police that Correia "was working as a prostitute on an as-needed basis, mostly on the weekends." At that point, Mondesir invoked her Fifth Amendment right not to incriminate herself. The court then instructed the jury that if it believed Mondesir made this earlier statement to the police, it could consider the statement "in assessing her credibility," but not for its truth.

Coleman objected to the district court's instruction, arguing that Mondesir's prior statement was admissible under Federal Rule of Evidence 807, the residual exception to the hearsay rule. The court overruled his objection. Coleman then moved for

a mistrial and also moved the court to reconsider its exclusion of Mondesir's statements to the police. The court denied both motions.

### i. Exclusion of Mondesir's Statements to the Police

Coleman argues that Mondesir's prior statements to the police were admissible under Rule 807 and that their exclusion violated his Sixth Amendment right to present a complete defense. In so arguing, he does not contest that her statements were hearsay. As a reminder, we review the district court's evidentiary rulings for abuse of discretion and its constitutional rulings de novo. See Brown, 510 F.3d at 66; Brown, 669 F.3d at 19. Despite the different standards of review, the analysis overlaps. Under Rule 807, a hearsay statement with sufficient guarantees of trustworthiness may be admitted for its truth when "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). Similarly, whether Coleman was entitled to introduce evidence of Correia's alleged prior sex work in order to present a complete defense hinges in large part on the probative value of this evidence. See supra Section II.D.4.i.

Even assuming Mondesir's alleged statement to the police was trustworthy, it was at most marginally probative of whether Coleman and Correia had consensual sex on the night that Correia

died. As we explained earlier, Correia's previous sexual relationships with individuals she already knew were not predictive of how she would interact with someone who was a complete stranger. Instead, the inference that any prior sex work, in and of itself, made it more likely that Correia would consent to sex with any man in any situation is the sort of highly prejudicial inference that led to Rule 412. See Fed. R. Evid. 412.

Further, the statement by Mondesir that Coleman sought to introduce was stripped of its context. Mondesir's discussion with the police in no way suggested that Correia would have agreed to a commercial sex transaction with a man she met on the street on the night that she was celebrating her birthday.

Additionally, as compared to other evidence in the record, Mondesir's alleged statement was not "more probative" of whether Coleman and Correia had consensual sex that night. Fed. R. Evid. 807(a)(2). For example, Dr. Vershvovsky had already testified that the autopsy she conducted revealed no physical signs of force or harm to Correia's genitals.

Considering the record as a whole, we see no evidentiary or constitutional error in the district court's decision not to admit Mondesir's alleged statement for its truth.

## ii. Invocation of the Fifth Amendment

The parties make several arguments about Mondesir's assertion of her Fifth Amendment right not to incriminate herself. Coleman argues that the district court abused its discretion by ruling that Mondesir had validly asserted her Fifth Amendment privilege. He also argues, in the alternative, that if Mondesir had properly asserted this privilege, her prior statement to the police should have come in as a statement against interest under Federal Rule of Evidence 804(b)(3). The government, for its part, argues that Coleman failed to preserve this challenge, such that plain error review applies, and that he has waived the claim entirely by failing to address the plain error standard on appeal.[29] See United States v. Aponte-Colón, 104 F.4th 402, 415 (1st Cir. 2024).

We bypass the Fifth Amendment issues because we conclude that Mondesir's alleged prior statement was inadmissible, regardless of whether the privilege applied. To the extent Coleman argues that he should have been able to question Mondesir about

---

[29] As the government points out, Coleman did not contemporaneously object to Mondesir's assertion of the Fifth Amendment privilege. Coleman did, however, file a motion for mistrial the next day, in which he contended that Mondesir had been allowed to "improperly assert a 'Fifth Amendment privilege' where it is clear that none exists." In denying that motion, the district court noted that it was "by no means clear . . . that that was a bad faith assertion of a Fifth Amendment right" in light of the relevant crimes.

her earlier statement to the police, even though she invoked the Fifth Amendment, the testimony that he sought to elicit would have been a characterization of Mondesir's prior statement, and that prior statement was itself inadmissible hearsay. Cf. United States v. Cascella, 943 F.3d 1, 6 (1st Cir. 2019) (foregoing deciding "whether the handling of the privilege-pleading witness was error" because that error was harmless). Mondesir's prior statement also would have been inadmissible under Rule 412 for the very same reasons that the evidence regarding specific instances of Correia's prior sexual behavior was inadmissible. See supra Section II.D.4.i. Thus, there was a real risk of encouraging the jury to decide the case on improper grounds. See Haines, 918 F.3d at 699 ("[T]he district court enforces the Rule to ensure that the jury decides the case based on proper considerations."). As a result, there was no error in excluding the statement, and we need not analyze the parties' Fifth Amendment arguments.

### iii. The Second Motion for a Mistrial

We turn now to Coleman's argument that the district court abused its discretion by denying his motion for a mistrial after Mondesir's testimony. Coleman's strategic decisions at the district court undermine his claim that the "last resort" of mistrial was appropriate here. Apicelli, 839 F.3d at 86. For example, he did not ask the court to strike Mondesir's testimony

or request a curative instruction, despite the court's invitation for him to do so.

Coleman insists, however, that only a mistrial would have been sufficient because Mondesir provided false testimony and caused a scene in the courtroom. To Coleman's first point, we are not convinced that Mondesir's testimony was false. Having carefully reviewed Mondesir's interview with the police, it is not clear that she would have described Correia's conduct as "working as a prostitute in the time period shortly before she died," which is how Coleman phrased his question to her at trial. Mondesir had used other terms to describe Correia's prior sexual behavior, and it was the police officer interviewing her who described Correia's conduct as "prostitution."[30] To the extent Mondesir's testimony was misleading, we cannot conclude it was so prejudicial as to require a mistrial, given our conclusion about the marginal probative value of her statement to the police.

To Coleman's second point, he has not demonstrated how Mondesir's "outbursts" in the courtroom prejudiced him to such an extent that "the last resort" of a mistrial was in order. The government argues that these outbursts largely reflected Mondesir's frustration at having to return to court to take the

---

[30] Because we do not agree that Mondesir gave false testimony, we also reject Coleman's argument in his pro se brief that the government violated his due process rights by failing to correct Mondesir's "false statements."

stand for a second time. And the record indicates that Mondesir's only statement directed at Coleman was that "[h]e killed her." But Coleman admitted to causing Correia's death; he disputed only how she died. On this record, we cannot conclude that the district court abused its discretion when it denied the motion for a mistrial.

## F. Sufficiency of the Evidence

At the close of the government's case, Coleman moved for a judgment of acquittal, arguing that the government had failed to introduce evidence sufficient to establish the elements of kidnapping. The district court denied Coleman's motion in a thorough oral decision, finding the evidence sufficient as to each element. Coleman renewed his motion at the close of evidence, and the court denied it again.

We review a preserved sufficiency challenge de novo. See United States v. Falcón-Nieves, 79 F.4th 116, 123-24 (1st Cir. 2023). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 123 (quoting United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998)). As we have explained:

> If the evidence "viewed in the light most
> favorable to the verdict gives equal or nearly
> equal circumstantial support to a theory of

guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt."

United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) (internal quotation marks omitted) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir.1995)).

To set the stage for our analysis, we briefly recount the elements of kidnapping. Under the federal kidnapping statute, the government had to show that Coleman (1) seized Correia and (2) held her for an appreciable time against her will (3) for ransom or reward or otherwise, and (4) willfully transported her in interstate commerce. See 18 U.S.C. § 1201(a)(1); Chatwin, 326 U.S. at 459-60. On appeal, Coleman contends that the government failed to establish the first three elements of kidnapping, including by failing to establish his intent as to these elements.

## 1. Seizure

Coleman argues that the government did not introduce sufficient evidence to meet the seizure element. This element can be met either by a physical or nonphysical taking. See 18 U.S.C. § 1201(a) ("Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away . . . any person . . . ."). In its opening statement, the government indicated

that "[t]he evidence will show how [Coleman] lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to death, and transported her across state lines into Rhode Island, all against her will." In its closing argument, the government contended that "[Coleman] tricked [Correia]."

There is no direct evidence in the record as to whether Coleman deceived Correia about his intentions that night. In fact, the record documents only five words from Coleman to Correia on February 24: Alqasir's testimony that Coleman told Correia something like "this is not your Uber." The government presented video evidence of Coleman and Correia talking briefly after that interaction, holding hands, and eventually walking together to his car. But there is no audio of their conversation.

The district court concluded that, viewing the record in the light most favorable to the government, the circumstantial evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Correia was seized. In particular, it held that a jury could conclude that Coleman "enticed [Correia] into the vehicle with the promise of a ride, but that [his] purpose was to hold or detain her for purposes of sexual gratification."

We agree with the district court's assessment of the record. The government presented evidence that Correia intended to return to Mondesir's apartment after leaving Venu. Hiltz testified that Correia told her that she was staying with Mondesir

that night and that she would "get an Uber home." And Mondesir testified that Correia left her belongings, including the keys to her own residence, at Mondesir's apartment. In the moments before Coleman approached Correia, Correia tried to get into a car with an Uber decal. Thus, the jury could have reasonably inferred that she was attempting to follow through on her plan to find an Uber to Mondesir's apartment. Further, a reasonable jury could infer that she left with Coleman because he offered her a ride. The fact that Coleman and Correia spoke for less than a minute before they walked away together also supports that inference. As the government argues, in light of all this evidence, the most obvious explanation for Correia's quick agreement to leave with Coleman is that he offered to drive her to Mondesir's apartment.

According to Coleman, however, it was equally likely, based on the evidence, that he offered Correia a ride and she later "agreed to have sex with [him]." He also argues that because the evidence was insufficient to show that he intended to sexually assault Correia, the government could not establish that he intended to deceive her. In support, he points to the evidence that he began that Saturday night seeking to go out with friends, spent his time in Venu with a willing partner, and calmly separated from that partner when she went home with her brother.

Coleman overlooks, however, the evidence that the district court highlighted in its sufficiency ruling, as well as

the court's obligation to view that evidence in the light most favorable to the government. That evidence indicated that Coleman approached an intoxicated young woman who was separated from her friends, without her shoes or jacket on a winter night, and had sex with her in his car just minutes later. Further, the evidence indicated a struggle in the car. As the district court reasoned, the most likely inference that a jury could draw from these circumstances, even if it was not the only possible inference, was that Coleman formed the intent to assault Correia before or soon after he approached her. See Morillo, 158 F.3d at 22 (we assess "all reasonable inferences[] in the light most favorable to the verdict" (quoting United States v. Garcia, 983 F.2d 1164, 1163 (1st Cir. 1993))).[31]

Because the evidence was sufficient to find that Coleman deceived Correia about his intent when they began to walk to his car, it was sufficient to satisfy the seizure element. See United States v. Stands, 105 F.3d 1565, 1576 (8th Cir. 1997) (finding sufficient evidence of seizure by inveiglement or decoy where the victim was lured into a car under a false pretense about the destination when in fact the plan was to take the victim to an

_____

[31] That Coleman had respectful interactions with one woman that night was not especially probative of whether he was capable of assaulting a different woman, particularly in light of the strong evidence of sexual assault we discuss below. See infra Section II.F.3.

isolated location to assault him); United States v. Hughes, 716 F.2d 234, 239 (4th Cir. 1983) ("By inducing his victim by misrepresentations to enter his vehicle and to accompany him, and knowing that the victim's belief as to their purpose and destination is different from his actual illicit purpose, the kidnapper has interfered with, and exercised control over, her actions. We find this conduct sufficient to satisfy the 'involuntariness of seizure and detention' requirement . . . .").

## 2. Holding

Coleman next contends that there was insufficient evidence to establish that he held Correia against her will for an "appreciable period." We begin with the legal framework for what qualifies as "holding" under the federal kidnapping statute. We then turn to Coleman's argument that the evidence was not sufficient to support the holding element.

### i. The Holding Requirement

The appreciable period requirement comes from the Supreme Court's seminal decision about the federal kidnapping statute, Chatwin v. United States. In that case, the Court explained that the "act of holding a kidnapped person" implies "an

unlawful physical or mental restraint for an <u>appreciable period</u>." 326 U.S. at 460 (emphasis added).[32]

Although several of our sister circuits have held that the appreciable period requirement is <u>not</u> met when a kidnapping is incidental to the commission of another crime, such as extortion or assault, we disagree and reject that view. These circuits generally treat a kidnapping as incidental to another crime when the time of the hold is not considerably longer than the time it takes to commit the other crime. See <u>Gov't of the Virgin Islands v. Berry</u>, 604 F.2d 221, 227 (3d Cir. 1979) (adopting a four-factor test to determine whether kidnapping is incidental to another crime); <u>United States</u> v. <u>Howard</u>, 918 F.2d 1529, 1535-36 (11th Cir. 1990) (adopting and applying <u>Berry</u>); <u>United States</u> v. <u>Jackson</u>, 24 F.4th 1308, 1314 (9th Cir. 2022) (same); <u>see also United States</u> v. <u>Krivoi</u>, 80 F.4th 142, 153 (2d Cir. 2023) (adopting a "narrowing gloss" on the federal kidnapping statute similar to the <u>Berry</u>

_____

[32] The government suggested in its brief that we could ignore this requirement because it is not found in the statute's text. We disagree. "We are bound by the Supreme Court's 'considered dicta.'" <u>United Nurses & Allied Pros.</u> v. <u>NLRB</u>, 975 F.3d 34, 40 (1st Cir. 2020) (quoting <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 19 (1st Cir. 1991)). In any event, the government agreed at oral argument that because the jury was instructed that the hold must be appreciable, the only issue on appeal is whether there was sufficient evidence to meet that standard.

test);[33] <u>United States</u> v. <u>Murphy</u>, 100 F.4th 1184, 1199 (10th Cir. 2024) (not adopting <u>Berry</u> but interpreting § 1201 to require "an appreciable temporal period of detention (i.e., holding) beyond that necessary to commit any other offense.").

Based on the plain language of the statute, we decline to adopt the requirement formulated in <u>Berry</u> and elsewhere that when a victim is necessarily held during the commission of another crime (e.g., assault or homicide), the hold must be appreciably longer than the time it takes to commit that offense. The kidnapping statute uses only the world "holds." 18 U.S.C. § 1201(a) ("Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away <u>and holds for ransom or reward or otherwise any person</u> . . . shall be punished by imprisonment . . . ." (emphasis added)). There is no indication from either the single word "holds" or the surrounding statutory context that Congress contemplated an "incidental kidnapping" exception.

The federal kidnapping statute was amended in 1934, two years after it was enacted, to broaden the purpose element from "for ransom or reward" to "for ransom or reward or otherwise."

---

[33] The U.S. Court of Appeals for the Second Circuit adopted the following test: "When a defendant is charged with both kidnapping and another offense, the defendant's conduct satisfies section 1201(a)'s second element . . . only if the defendant held the victim for a period that was appreciably longer than the time required to commit the other offense." <u>Krivoi</u>, 80 F.4th at 153.

See Gooch, 297 U.S. at 127-28 (discussing the amendment).  As we discussed earlier, see supra Section II.A, the term "otherwise" could encompass a criminal purpose, such as sexual assault.  In light of the amendment, it makes little sense to us that "an extended detention would be a kidnapping if done just for the sake of it, but not a kidnapping if done to accomplish some attendant offense."  Cardozo v. United States, 315 A.3d 658, 676 (D.C. 2024).[34]

Our sister circuits relied on Chatwin's discussion of the risks of overzealous prosecution to justify the incidental kidnapping exception.  See, e.g., Berry, 604 F.2d at 226; Krivoi, 80 F.4th at 153.  In Chatwin, the Supreme Court expressed its concern that a broad reading of the federal kidnapping statute could be used to prosecute "unattractive or immoral situations lacking the involuntariness of seizure and detention which is the very essence of the crime of kidnap[p]ing."  326 U.S. at 464.  The Court went on to state that "the purpose of the Act was to outlaw interstate kidnap[p]ings rather than general transgressions of morality involving the crossing of state lines."  Id.

But we do not understand the Supreme Court's language in Chatwin -- which emphasized the risk of prosecuting immoral, not

_____

[34] The District of Columbia Court of Appeals rejected the Berry test in the context of D.C.'s kidnapping law, which was modeled after the federal statute and enacted just one year later. See Cardozo, 315 A.3d at 666 n.3, 669.

illegal, behavior -- to have endorsed an atextual exception to the kidnapping statute when seizure and detention are incidental to another crime.  Instead, the requirements that a victim be seized and held involuntarily for an appreciable period serve to ensure that the federal kidnapping statute, which carries severe penalties, is not applied to situations "lacking the characteristics of true kidnap[p]ings." Id.  For this reason, we do not agree with Coleman that adopting an "incidental kidnapping" exception is necessary to ensure that the government does not charge crimes such as robbery and sexual assault as kidnapping.

**ii. The Sufficiency of the Evidence to Establish a Holding**

Having clarified our understanding of the holding requirement of 18 U.S.C. § 1201(a), we turn to Coleman's argument that the government did not produce sufficient evidence for the jury to find that Coleman held Correia for an appreciable period. For the reasons we set out above, we reject Coleman's argument that we must subtract the time it would have taken to hold Correia during a sexual assault and homicide in evaluating the evidence on whether the hold was "appreciable."  As a reminder, the government argued that the sexual assault and homicide occurred during the 12-minute stop on Tremont Street.  Thus, we focus our analysis on what we perceive to be the possible time periods for the hold, including the 12-minute stop during which the government alleged Coleman sexually assaulted and killed Correia.

The parties disagree about the duration of the hold. The government argues that the hold was 27 minutes, claiming that it began when Coleman deceived Correia into leaving with him and ended sometime during the 12-minute stop on Tremont Street. For his part, Coleman contends that the hold cannot include the 6-minute walk to his car because even if he deceived Correia, she was not confined during the walk. We conclude that we need not resolve whether both the seizure and the hold began when Coleman allegedly deceived Correia into walking to his car.[35]

Whether the hold was 27 minutes, including the walk to Coleman's car, or 21 minutes, excluding the walk to the car, a reasonable jury could conclude, based on the facts here, that the hold was for an appreciable period. In applying Chatwin's requirement that a hold be appreciable, courts assess not only the duration of a hold but also its qualitative aspects. See, e.g., Krivoi, 80 F.4th at 151 ("[W]hen determining whether a victim's

---

[35] As we discuss in detail later, a hold could be carried out through deception alone. See infra Section II.G.1.iii. At oral argument, Coleman contended that, separate from the question of whether a hold can be accomplished by deceit, the circumstances of the walk to his car suggested it could not count as part of the hold. He pointed out that Correia was not "led away" because she was interacting with multiple people, she was in a populated area, she appeared to leave with Coleman voluntarily, she was able to support herself and jump onto Coleman's back, and she entered his car herself. Because a reasonable jury could find that the hold here was appreciable even after subtracting the time to walk to Coleman's car (thus leaving a 21-minute time period), we need not resolve whether indicia of voluntariness could undermine a finding that the walk was part of the hold.

detention is 'appreciable,' we consider not only the detention's length but also other aspects of the detention, such as the extent of the danger posed to the victim."); Cardozo, 315 A.3d at 678 (although the duration of a hold is a key factor, in close cases "a jury can and should consider the entire factual context of the situation when determining if somebody has been held for such a time and in such a manner that they could be fairly described as being held captive as a hostage or a prisoner").[36]  One such qualitative aspect is the isolation of the victim, which we have noted is dangerous precisely because it "increases the likelihood that the victim will be harmed." United States v. Cunningham, 201 F.3d 20, 28 (1st Cir. 2000) (citation omitted) (reviewing the application of an "abduction" enhancement under the U.S. Sentencing Guidelines, § 2E2.1(b)(3)(A), to a non-kidnapping crime).  Here, the government presented evidence that Correia was isolated from her friends, was moved from a more populated area to a less populated area, and was strangled to death.  From the evidence in this case, a rational jury could find that either a 21-minute or a 27-minute hold was appreciable.

---

[36] Coleman cites Cardozo for the proposition that a hold less than 30 minutes is generally not appreciable. See 315 A.3d at 677-78.  But in Cardozo, the D.C. Court of Appeals explicitly rejected a bright-line rule and made clear that the court and the jury should consider whether "other hallmarks of kidnappings are present in [close] cases." Id. at 678.

Coleman argues that several pieces of evidence undermine this finding: videos showed that Tremont Street was well-lit when the car stopped for 12 minutes, they did not show the car moving or any signs of struggle, and there was testimony that Correia could have opened the passenger side door. He claims that, based on this evidence, it is "equally plausible that Coleman and Correia had consensual sex during this time, and the struggle resulting in her death happened later, during the unrecorded hours."

We disagree that Coleman has presented an "equally plausible" theory requiring a ruling in his favor on sufficiency grounds. The jury watched videos showing that after the stop on Tremont Street, Coleman drove down a one-way street and then drove quickly in reverse on that same street in the wrong direction when he encountered two police cars. Based on that evidence, the jury could have reasonably found that Correia was already dead, or incapacitated by serious injuries, after the stop on Tremont Street. Because there was no other time before the 12-minute stop when the assault and homicide could have occurred, it was not equally as likely that Coleman and Correia had only consensual sex during that 12-minute stop. And, as to the testimony that Correia could have opened the passenger side door, the jury also heard testimony that Coleman weighed 200 pounds and Correia weighed only 119 pounds. Finally, the jury heard testimony that Correia's toxicology report showed a blood alcohol concentration level that

was three times the level of presumptive intoxication in Massachusetts. Under these circumstances, regardless of whether Coleman had locked the doors and whether Correia technically could have opened the passenger side door, we agree with the district court that "[i]t might not have been obvious to her" that she could do so, especially when it was fair to conclude that she was "intoxicated and panicking and struggling." Thus, the evidence was sufficient for the jury to conclude that Correia was confined in the car.

### 3. Purpose

Coleman next argues that there was insufficient evidence to satisfy the purpose element of the kidnapping statute. The government argued at trial that Coleman either held Correia for sexual gratification or to prevent her from reporting a crime to the police. Because both theories were premised on a sexual assault having occurred, Coleman argues that there was insufficient evidence as to the purpose element because there was insufficient evidence that intercourse was nonconsensual.

We disagree. To be sure, Dr. Vershvovsky testified that there were no injuries to Correia's genitals, but she also testified that this did not rule out sexual assault. Considering the DNA evidence of sexual intercourse and the evidence of a struggle in the car -- including the injuries to the rest of Correia's body and the cracks in the windshield of the car -- the

jury could reasonably infer that Correia did not consent to sex with Coleman.

This same evidence undermines Coleman's argument that the government did not prove that he intended to seize Correia and hold her against her will for personal benefit.  For the reasons we have discussed, a rational jury could find that Coleman deceived Correia into walking to his car when his intent was to sexually assault her, and thus that he had the intent to hold her for the time necessary to assault her.

## G. Jury Instructions

Coleman argues that the district court committed several errors in instructing the jury that, either independently or cumulatively, require reversal.

We review "[a] district court's refusal to give a requested instruction . . . de novo." United States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir. 2015).  To prove error, the defendant bears an initial burden to show that "the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" Id. (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)).  "Assuming that the defendant satisfies this initial burden, we 'will reverse a district court's decision to deny the instruction only if the instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3)

integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense.'" Id. (quoting United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013)). In conducting this analysis, we will assume Coleman met his burden of demonstrating that the evidence plausibly supported his theory of the case.[37]

We take each of Coleman's challenges to the jury instructions in turn and ultimately reject each of them.

## 1. The Seizure Element Instructions

Coleman challenges the district court's refusal to adopt several of his proposed instructions on the seizure element and argues that the instruction that the court did provide was erroneous. First, he requested an instruction defining "inveigle" as to "entice, cajole, or tempt a victim by false promises, false representations, or other deceitful means." Second, he requested two instructions that the government must prove that he "seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim without her consent." Third, Coleman requested an

_____

[37] Coleman generally challenges both the district court's refusal to give his requested instructions and the district court's jury instructions. We analyze the latter challenge "under a two-tiered standard." United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010). We review whether the district court's instructions contained an error of law de novo, but "we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." Id. (internal quotation marks omitted) (quoting United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009)).

instruction that the jury must "must be convinced beyond a reasonable doubt that [he] had the willingness and intent to use physical force to complete the kidnapping if the deception failed" in order to find that he inveigled or decoyed Correia.

The district court rejected these proposed instructions. Instead, it instructed the jury on seizure as follows:

> The first element of the crime of kidnapping that the government must prove is that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim.
>
> . . .
>
> "Inveigle" and "decoy" both involve the non-forcible taking of a victim, in which a defendant entices or lures the victim in some way into accompanying him or remaining with him.
>
> To "inveigle" means to entice, cajole, or tempt a victim. That may include deceitful means, such as false promises or representations, although such false promises or representations are not required.
>
> To "decoy" means to entice or lure a victim by means of some fraud, trick or temptation.
>
> The fact that the victim may have accompanied the defendant voluntarily at first does not necessarily mean that a kidnapping did not occur. Even if the victim accompanied the defendant voluntarily at first, circumstances might have changed, and the defendant at some later point may be found to have seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim.

### i. "Inveigle"

We begin with the district court's instruction defining "inveigle." The heart of the parties' dispute is whether "inveigle" requires an element of deceit. The court instructed the jury that inveiglement "may include deceitful means, such as false promises or representations, although such false promises or representations are not required." (Emphasis added). Coleman argues that this instruction was erroneous because "inveigle" in the context of the federal kidnapping statute must involve deceit. The government responds that Coleman has waived this argument for lack of development and that, in any event, the district court's instruction was entirely proper.

We have not previously addressed the meaning of "inveigle," and we see no reason to do so here because the instructional error that Coleman alleges could not, on the facts of this case, have affected the verdict.[38] Cf. United States v. McLellan, 959 F.3d 442, 466 (1st Cir. 2020) (explaining that an overly broad instruction is not grounds for reversal if "it appears beyond a reasonable doubt" that the instruction did not affect the verdict). The government's theory at trial was that Coleman deceived Correia. The government relied on evidence that Correia intended to return to Mondesir's apartment after leaving Venu and

---

[38] For that same reason, we bypass the government's waiver argument.

that Coleman had been "shut down with respect to getting together with [another woman]" to argue that Correia left with Coleman because he offered "to give her a ride where she wanted to go," but his real intent was "to have sex with her." The government summed up its theory like this: "He tricked her. So, in other words, the defendant decoyed and inveigled [Correia], and as a result, [she] set off with the defendant towards his car." Coleman, for his part, argued during closing that the evidence showed Correia voluntarily left with him, they had consensual sex, and they later ended up in a violent altercation resulting in Correia's death. Responding directly to the government's theory, Coleman claimed that there was no evidence that he had offered Correia a ride as a trick.

Ultimately, the jury heard no argument that Coleman inveigled Correia through non-deceitful means. From the evidence presented, the jury was free to make the inference that the government urged -- that Coleman deceived Correia by offering her a ride to Mondesir's apartment. It was also free to reject that inference and accept Coleman's argument that Correia went with him willingly. But if the jury agreed with Coleman, then we must presume that it followed the district court's instruction that "[e]ven if the victim accompanied the defendant voluntarily at first, circumstances might have changed," such that the jury could find that "the defendant at some later point . . . seized,

confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim." Remember, the jury could have found that the seizure began in the car, and there was ample evidence of a physical struggle, leading to Correia's death. See supra Section II.F.2.ii. Thus, we determine that the instructional error Coleman alleges could not have altered the verdict here and would have been harmless beyond a reasonable doubt. To be clear, we are not suggesting that an error occurred as to this instruction.

### ii. Consent

The district court did not err in denying Coleman's request for an instruction about consent. Coleman requested the district court to instruct the jury, both in the overview of the elements of kidnapping and in the definition of the seizure element, that the government must prove "that the defendant unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim without her consent." The court rejected this request and left out the phrase "without her consent" in both places. It later gave an instruction about consent as it related to the holding element. Coleman argues that the refusal to give his proposed instruction was erroneous. The government does not contest that Coleman's proposed instruction was substantively correct but rather argues that the district court "effectively" addressed consent with its own instruction.

Coleman's requested instruction was substantively correct as a matter of law. The Supreme Court has explained that "the involuntariness of seizure and detention . . . is the very essence of the crime of kidnapping." Chatwin, 326 U.S. at 460 (emphasis added); see also Powell, 226 F.3d at 1194 (finding an instruction explaining that both seizure and detention require a lack of consent sufficiently covered the lack of consent element). Thus, it would have been appropriate to include an explicit instruction regarding consent in describing both the seizure and holding elements.

The district court did not err by refusing to include Coleman's proposed instruction, however, because the proposed instruction was already substantially covered by the court's other instructions. In reference to the seizure element, the court instructed the jury as follows:

> The fact that the victim may have accompanied the defendant voluntarily at first does not necessarily mean that a kidnapping did not occur. Even if the victim accompanied the defendant voluntarily at first, circumstances might have changed, and the defendant at some later point may be found to have seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away the victim.

(Emphasis added). The concept of voluntariness comes from the language used in Chatwin and, in our view, fairly covers the concept of consent. See 326 U.S. at 464. By instructing the jurors that they could find the seizure element met if

- 97 -

circumstances changed after Correia voluntarily left with Coleman, the court necessarily indicated that leaving voluntarily with Coleman would <u>not</u> satisfy the seizure element.

Coleman separately argues that the district court's instruction regarding voluntariness was improper because it included a "factual scenario[]" and thus suggested the verdict. We disagree that the instruction suggested the verdict. Instead, it correctly explained that Correia could still be seized even if she consented to walk to Coleman's car. Accordingly, we find no error in the district court's treatment of the consent issue.

### iii. Physical Force

The district court did not err by rejecting Coleman's proposed instruction about a physical force requirement. Coleman requested an instruction that "[t]o find the defendant inveigled or decoyed the victim, you must be convinced beyond a reasonable doubt that the defendant had the willingness and intent to use physical force to complete the kidnapping if the deception failed."

Coleman cannot succeed on this challenge because his proposed instruction was not a correct statement of law. The federal kidnapping statute includes no physical force requirement, and the words themselves -- "inveigle" and "decoy" -- do not implicitly suggest such a requirement. Nor do the cases cited by Coleman establish a physical force requirement. <u>See</u> <u>United States</u> v. <u>Boone</u>, 959 F.2d 1550, 1555 (11th Cir. 1992) (requiring that a

defendant have the intent to use physical or psychological force to complete a kidnapping by inveiglement); United States v. Gillis, 938 F.3d 1181, 1207-09 (11th Cir. 2019) (discussing Boone); United States v. Higgs, 353 F.3d 281, 313-14 (4th Cir. 2003) (applying Boone's physical or psychological force test).

In Chatwin, the Court concluded that there was "no proof that [any defendant] willfully intended through force, fear or deception to confine the girl against her desires." 326 U.S. at 460. This conclusion strongly suggests that a kidnapping through inveiglement or decoy could be established where the kidnapper only used deception to confine a victim. Because neither the statute nor the relevant case law supports a physical force requirement, the district court did not err in rejecting Coleman's proposed instruction. Further, whether the statute's text requires psychological force is not at issue in this case, so we do not reach that question.

## 2. The Holding and Purpose Elements Instructions

Coleman raises two challenges related to the holding element instructions. The district court instructed the jury as follows:

> [T]he government must prove that the defendant held or detained the victim against her will for "ransom, reward, or otherwise."
>
> Here, the government alleges that the victim was held not for "ransom or reward," but

> "otherwise" -- that is, for one or more other purposes.
>
> The term "otherwise" can include holding or detaining a person (1) for purposes of sexual gratification or (2) to prevent detection of a crime or a report to law enforcement.

Coleman argues that the district court's instruction was erroneous because it bolstered the government's case and permitted a conviction for any reason, such as anger, confusion, or fear. He contends that the district court instead should have adopted his proposed instruction, which would have replaced "otherwise" with "other benefit [to Coleman]" and excluded the sentence beginning with "[t]he term otherwise."[39]

Coleman's preferred instruction was substantively correct as a matter of law, but it was also captured by the word "otherwise." In Gooch, the Supreme Court explained that by adding the phrase "or otherwise" to the language of the federal kidnapping statute, "Congress intended to prevent transportation in interstate or foreign commerce of persons who were being unlawfully restrained in order that the captor might secure some benefit to himself." 297 U.S. at 128. It further concluded that this intent

---

[39] Coleman's requested instruction also included a sentence stating that "otherwise" cannot be for sexual gratification. He argues on appeal that this instruction was necessary to rectify the alleged errors related to the indictment, including what he claims was a Presentment Clause violation. For the reasons we discussed earlier, see supra Section II.A, the indictment was sufficient and there was no Presentment Clause violation here. Accordingly, a curative instruction was not necessary.

was "adequately expressed by the words of the enactment." Id. Thus, we understand the language "or otherwise" to have captured the same meaning as "other benefit." Further, we do not agree with Coleman's one-sentence argument that the jury could have interpreted "or otherwise" to mean on the basis of his anger, fear, or confusion. The district court's instruction that "or otherwise" is "for one or more purposes" made clear that "or otherwise" does not include action on an emotion.

In his pro se brief, Coleman also argues that the district court erred by failing to give the Berry instruction he requested. Coleman had asked the court to instruct the jury that it must find Correia had been "held or detained against her will without her consent for an appreciable period of time that is beyond that inherent in her death and alleged sexual assault." The district court declined to give that instruction and instead instructed the jury only that Correia must have been "held or detained for an appreciable period against her will." For the reasons we provided in rejecting Coleman's argument that there was insufficient evidence of an appreciable hold, see supra Section II.F.2.i, we also conclude that this proposed instruction was not substantively correct as a statement of law, and thus the district court did not err in omitting it.

### 3. The Consciousness of Guilt Instruction

Coleman argues that the district court erred in refusing to adopt each of his proposed changes to the instruction on intent. The court instructed the jury on assessing Coleman's intent as follows:

> In assessing the defendant's intent, you may consider evidence that he took certain actions or engaged in certain conduct after the crime was alleged to have been committed. Such actions or conduct may indicate that the defendant thought he was guilty of one or more crimes and was trying to avoid detection and punishment. You are not required to draw such an inference, but you may do so if it is reasonable to do so under the circumstances. Mere flight, without more, is not necessarily indicative of feelings of guilt. It is up to you to decide what weight, if any, to give to any such evidence.

Coleman had requested three additions to the instruction, which the court did not adopt. His suggestions would have resulted in the following complete instruction:

> In assessing the defendant's intent, you may consider evidence that he took certain actions or engaged in certain conduct after the crime was alleged to have been committed. Such actions or conduct may indicate that the defendant thought he was guilty <u>of the crime charged</u> and was trying to avoid detection and punishment. You are not required to draw such an inference, but you may do so if it is reasonable to do so under the circumstances. Mere flight, without more, is not necessarily indicative of feelings of guilt. <u>It is possible that the fleeing person is innocent but believes that contact with police could be dangerous.</u> It is up to you to decide what weight, if any, to give to any such evidence,

> but "consciousness of guilt" evidence is never enough by itself to convict a person of a crime.

(Emphasis added).

Assuming that Coleman's suggested additions were substantively correct as a matter of law, he has developed no argument as to why their omission "seriously impaired [his] ability to present his defense." Figueroa-Lugo, 793 F.3d at 191. He makes no argument as to his first proposed addition at all, and thus we deem that claim of error waived. See Zannino, 895 F.2d at 17. Regarding the second requested addition, Coleman remained free to argue the point. He articulates no reason why this statement needed to be included in the jury instructions, which already stated that "mere flight, without more, is not necessarily indicative of feelings of guilt." Finally, regarding the third requested addition, the district court instructed the jury on the requirements of the kidnapping statute in detail. There is no reason to think the jury would have thought "consciousness of guilt" alone was enough to convict.

### 4. Other Challenges to the Jury Instructions

Coleman raises four additional challenges to the jury instructions. None of these challenges are meritorious.

First, Coleman requested that the district court instruct the jury, three times, that "[t]estimony or other evidence that has been struck is not evidence and cannot be considered by

you." The court gave this instruction only once, when it explained what is <u>not</u> evidence. It chose not to include a similar statement in its instructions regarding improper considerations and what <u>is</u> evidence because it considered that "exceedingly redundant." There is no disagreement that Coleman's proposed instruction was correct as a matter of law, but we see no reason why the district court was required to provide the same instruction three times over.

Second, Coleman requested that the district court refer to him as Mr. Coleman and Correia as Ms. Correia, rather than as defendant and victim, throughout the instructions. Coleman's one-sentence argument on this point in his brief fails to persuade us that the court erred.

Third, Coleman argues that the district court's instruction on reaching a verdict was coercive. The court instructed the jury as follows:

> Each of you must decide the case for yourself, but you should do so only after considering all the evidence, discussing it fully with the other jurors, and listening to the views of the other jurors.
>
> Do not be afraid to change your opinion if you think you are wrong, but do not come to a decision simply because other jurors think it is right.
>
> It [is] important that you reach a verdict if you can do so conscientiously. You should not hesitate to reconsider your views from time to

> time and to change them if you are persuaded that this is appropriate.
>
> It is important that you attempt to return a verdict, of course, but only if each of you can do so after having made your own conscientious determination. Do not surrender an honest conviction as to the weight and effect of the evidence simply to reach a verdict.

Coleman objected to the inclusion of the last two paragraphs of this instruction. He contends that instructing the jury that it was "important" to reach a verdict and that individual jurors should "reconsider" their views was coercive and inappropriate before a deadlock. In his view, the instruction created Allen charge concerns.

An Allen charge is "a supplemental instruction that a judge may give to a jury when it is deadlocked in its deliberations." United States v. Amaro-Santiago, 824 F.3d 154, 161 (1st Cir. 2016) (citing Allen v. United States, 164 U.S. 492 (1896)). An Allen charge can have a coercive effect, so we require an Allen charge to include "three . . . elements to moderate any prejudice." Id. at 163 (quoting United States v. Hernández-Albino, 177 F.3d 33, 38 (1st Cir. 1999)). "Specifically, it must '(1) communicate the possibility of the majority and minority of the jury reexamining their personal verdicts; (2) restate the government's maintenance of the burden of proof; and (3) inform

the jury that they may fail to agree unanimously.'" Id. (quoting United States v. Peake, 804 F.3d 81, 98 (1st Cir. 2015)).

We find no error in the district court's instruction on reaching a verdict. Coleman selectively quotes language from the charge in his brief but, when viewed in full, the instruction suggests only that each juror should keep an open mind and consider the views of other jurors. The court's mild instruction on deliberation also does not raise Allen charge concerns. The instruction repeats twice that jurors should not change their mind or surrender their own opinions for the sake of a verdict. It is hard to discern any coercive effect from the instruction, especially at the point that the instruction was given -- prior to deliberation, when no minority and majority could have formed. Further, the mitigating language required of a true Allen charge would be confusing here: deliberations had not begun; the court's charge already addressed the government's burden of proof; and the charge made clear that the jury did not have to reach unanimity in the last paragraph.

Fourth, Coleman argues that the district court's failure to instruct the jury that the government had to prove Correia's death resulted from her kidnapping was erroneous. The court instructed the jury as follows:

> The fifth element of the crime of kidnapping that the government must prove is that the

defendant's acts resulted in the victim's death.

To satisfy this element, the government must prove that the victim is dead, and that her death resulted from the willful and intentional conduct of the defendant. To establish that the defendant's conduct resulted in the death of the victim, the government must prove that but for the defendant's actions, the victim would not have died.

Coleman proposed an instruction replacing the reference to "the defendant's acts" in the first sentence with "the defendant's kidnapping" and the reference to "the willful and intentional conduct of the defendant" with "the willful and intentional kidnapping by the defendant." The government does not contest that Coleman's instruction was accurate.

Coleman's instruction is substantively correct. See United States v. Rodríguez-Santos, 56 F.4th 206, 215 (1st Cir. 2022) (the "death resulted" element of the federal kidnapping statute requires that "kidnapping is a but-for cause of the death" (citation omitted)). Nevertheless, we agree with the government that the context preceding this instruction made clear that "the defendant's acts" were those acts related to the offense of kidnapping.

## H. Sentencing

Coleman challenges his sentence, arguing that the district court should not have applied a cross-reference that raised the base offense level. He concedes that applying the

cross-reference had no effect on his sentence because the federal kidnapping statute mandates a life sentence for kidnapping resulting in death. However, he appealed to preserve his argument in case relief is available in the future.

The U.S. Sentencing Guidelines set the base offense level for kidnapping at 32. See U.S.S.G. § 2A4.1(a). There is, however, a cross-reference that states "[i]f the victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111," the sentencing guidelines for first degree murder apply. U.S.S.G. § 2A4.1(c). Under § 1111, "[e]very murder . . . committed in the perpetration of . . . kidnapping" is first degree murder. 18 U.S.C. § 1111(a). First degree murder carries a base offense level of 43. See U.S.S.G. § 2A1.1(a).

The district court concluded, over Coleman's objection, that the cross-reference applied because Coleman's actions constituted first degree murder and set the base offense level at 43. The court noted that the disagreement over the base offense level is "entirely technical" because 18 U.S.C. § 1201(a) requires life imprisonment.[40]

Coleman argues to us, as he did to the district court, that the cross-reference does not apply because he did not kidnap or sexually assault Correia. His argument on this point is

_____

[40] The statute also allows for the death penalty, but the government did not seek the death penalty in Coleman's case.

entirely coterminous with his sufficiency of the evidence arguments. Having rejected Coleman's sufficiency arguments, we now reject his challenge to the district court's application of the sentencing guidelines.

### I. Cumulative Error

Coleman contends that even if none of the district court's errors during the trial individually required reversal, the errors require reversal under the cumulative error doctrine. We review claims of cumulative error "against the background of the case as a whole" and place

> particular weight [on] factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); and the strength of the government's case.

Sepulveda, 15 F.3d at 1196.

The cumulative error doctrine does not require reversal here, because we have found no errors that could have had a cumulative effect. Having spent considerable time with the record, it is clear to us that the district court rendered deliberate and well-reasoned rulings throughout this complex case.

### J. Coleman's Pro Se Brief

To the extent that arguments in Coleman's pro se brief overlap with or relate to arguments in his counseled brief, we have addressed those arguments throughout this opinion. We now

address the unique claims raised in his pro se brief.  We find none of these additional claims persuasive.

First, Coleman contends that the government suppressed exculpatory evidence from Correia's cellphone.  This argument appears to arise from confusion over the testimony at trial. Correia's cellphone was not recovered with her body.  An FBI agent testified at Coleman's trial that Correia's phone was "found," but by that statement he meant that the phone was activated by someone -- wherever it had been abandoned -- not that the FBI had recovered it.  The same agent confirmed he had only Correia's phone records.  The government reiterated in its response to Coleman's pro se brief that the phone was never obtained by law enforcement. Accordingly, there is no basis for the exculpatory evidence claim.

Second, Coleman argues that his trial counsel was ineffective for failing to analyze his Google location data. Together with his brief, he provided us with an estimate of his car's velocity at various points based on the location data presented at trial.  He argues that these estimates support his theory that he and Correia got into a physical altercation after the 12-minute stop on Tremont Street.  Because Coleman did not raise this claim with the district court, we dismiss it without prejudice to his right to pursue post-conviction relief under 28 U.S.C. § 2255 in that court.  See United States v. Padilla-Galarza, 990 F.3d 60, 93-94 (1st Cir. 2021).

Third, Coleman raises several statutory and constitutional challenges to the federal kidnapping statute, 18 U.S.C. § 1201(a)(1), all related to whether the victim must be alive when interstate transportation begins. Because these arguments were not raised in the district court, we review them for plain error. See United States v. Candelario-Ramos, 45 F.4th 521, 524 (1st Cir. 2022). But Coleman "makes no attempt to show how his . . . claim[s] satisf[y] the demanding plain-error standard -- his brief fails to even mention plain error, let alone argue for its application here." Id. at 525 (quoting United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021)). Thus, he has waived this claim. See id.

That said, there was no plain error as to any of these particular claims. Coleman argues that the statute should not be interpreted to permit federal jurisdiction when the victim was dead before interstate travel began.[41] But he concedes that the statute was amended to rebuff exactly the interpretation that he urges, by removing language that required the victim to be alive at the start of interstate travel. See Adam Walsh Child Protection

_____

[41] Section 1201 is structured to include both general elements -- i.e., seizure, hold, and purpose -- as well as five jurisdictional hooks. The first jurisdictional hook, applicable here, is based on the use of interstate commerce and applies when the victim is transported in interstate commerce, "regardless of whether [she] was alive when transported across a State boundary." 18 U.S.C. § 1201(a)(1).

and Safety Act of 2006, Pub. L. 109-248, § 213, 120 Stat. 587, 616 (striking "if the person was alive when the transportation began" from 18 U.S.C. § 1201(a)(1)).[42]   Coleman also argues that the removal of the "alive when transportation began" language from the statute makes it unconstitutionally vague, facially and as-applied to him.   But the thrust of his argument is that the statute has a broad application; the mere fact that a statute is broad does not, on its own, establish that it is vague.

### III. CONCLUSION

For all these reasons, we **affirm** Coleman's conviction and sentence.

---

[42] Based on his interpretation of the statute, Coleman argues that the indictment failed to charge the jurisdictional element by omitting when Correia died.  The indictment did not need to establish when Correia died.  The indictment charged that Correia was "willfully transported in interstate commerce." Coleman makes a related argument that the government failed to show sufficient evidence of the jurisdictional element because under its own theory, Correia had died before Coleman traveled outside of Massachusetts.  But as we have just explained, the interstate travel after Correia died satisfied the jurisdictional element of 18 U.S.C. § 1201(a)(1).